No. 87,295

IN THE MATTER OF THE APPEAL OF NATIONAL COOPERATIVE REFINERY ASSOCIATION FROM AN ASSESSMENT OF KANSAS CORPORATE INCOME TAX.

(44 P.3d 398)

Opinion filed April 19, 2002.

*John Michael Hale,* of Legal Services Bureau, Kansas Department of Revenue, argued the cause and was on the briefs for appellant.

*Jack D. Flesher,* of Bever Dye, LC, of Wichita, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: The Kansas Department of Revenue (Revenue) appeals from a final order of the Board of Tax Appeals (BOTA). At issue is Revenue's assessment against National Cooperative Refinery Association (NCRA) for additional corporate income tax and interest for tax years ending September 30, 1993, 1994, and 1995. The additional assessment is due to Revenue's determining, pursuant to K.S.A. 79-32,141, that NCRA, a Kansas business, and Cenex, Inc. (Cenex), a Minnesota business, are unitary so that NCRA must use the combined report method of allocating income and expenses in order to clearly reflect income of the businesses. NCRA appealed Revenue's decision to BOTA, which overturned it. The appeal was transferred from the Court of Appeals on this court's order. K.S.A. 20-3018(c).

Revenue lists five issues; NCRA suggests that there is a single issue and three sub-issues. We conclude the issue on appeal is whether NCRA and Cenex are required by K.S.A. 79-32,141 to use the combined report method of allocation of income and expenses. BOTA held that they were not required to do so.

The parties filed a stipulation of facts, which BOTA incorporated into its order. NCRA filed proposed findings of fact, which BOTA also incorporated into its order. On this appeal, Revenue asserts that only a few facts are necessary for resolution of the issue, but does not challenge any of the facts incorporated by BOTA into its

order. The following narrative statement of facts is based on the facts stated in and incorporated into BOTA's order. All facts reflect circumstances during the years for which the additional tax assessment was made, the tax years ending September 30, 1993, 1994, and 1995.

NCRA is a Kansas cooperative marketing association organized in 1943 as a nonprofit association under the Kansas Cooperative Marketing Act, K.S.A. 17-1601 *et seq.* NCRA owns all outstanding capital stock of its subsidiary corporations—Clear Creek, Inc., Clear Creek Transportation, Inc., Petroleum Resources, Inc., PRC Property Holdings, Inc., Jayhawk Transportation Corp., and Jayhawk Pipeline Corp. NCRA and its subsidiaries filed consolidated federal and Kansas income tax returns for the tax years at issue.

Cenex is organized and operated under the cooperative association laws of Minnesota. It has approximately 1,600 members, which are local farmer cooperatives located in 15 north-central and northwest states.

NCRA is solely in the business of refining crude oil for supply of petroleum products, primarily fuel, to its stockholders. Cenex's business consists of furnishing to its members the following: farm supplies, including refined fuels, fertilizer, insecticides, herbicides, lubricants, propane, tires, vehicle accessories, and information/ technology services. Cenex owns a refinery that produces asphalt. NCRA produces no asphalt.

Cenex bought 44% of NCRA's stock in 1990. In July 1992, Cenex bought Farmland's NCRA stock to bring Cenex's ownership up to approximately 74%. Growmark, Inc., an Illinois cooperative association owns 19% of NCRA's stock, and MFA Oil Company, a Missouri cooperative, owns 7%. NCRA's stockholders (also known as members) have the right to purchase NCRA's products in proportion to the percentage of stock held.

Shortly after acquiring more than half of NCRA's stock, Cenex attempted to exercise control over NCRA. Growmark and MFA filed an action in the United States District Court for the District of Kansas seeking to block Cenex's attempt to seize control. Under the court-approved settlement of the action, NCRA is governed by a six-member board of directors, four appointed by Cenex, one by

Growmark, and one by MFA. A general manager conducts day-to-day operations of NCRA and reports to the board of directors. The parties agreed that NCRA will continue to operate on a cooperative basis and agreed to retain historic policies and practices of product allocation and earnings allocations and distributions.

NCRA's annual sales are approximately $650 million. Cenex's annual sales are approximately $2 billion. NCRA's total assets (at book) are $400 million. Cenex's total assets are well over $1 billion.

NCRA directors who were appointed by Cenex held no other positions of authority over NCRA and "did not participate in the management or operation of NCRA to any extent." NCRA and Cenex had no common managers, officers, or employees. There were no transfers of employees between NCRA and Cenex. Each company had its own separate personnel and hiring policies and employee benefit plans. There were no technical service agreements between the companies.

Neither company used the other's facilities, with the exception of one lease arrangement between the two companies. NCRA leases three storage tanks that Cenex owns near NCRA's refinery for $21,000 per year. The lease agreement is an arm's length transaction. NCRA has many storage tanks on its own property.

Cenex's refinery uses primarily Canadian crude oil; NCRA does not. They do not purchase crude oil from the same sources. Each maintains its own separate crude oil supply department and personnel.

In addition to their separate departments for supply, each company maintains its own separate department for production, environment and safety, security, product distribution, transportation, accounting, personnel and human resources and public relations. The two companies did not coordinate activities in security, pollution control and permits, health insurance, refinery operation manuals, personnel matters, research and library resources, disposition of by-products, and information systems. The two companies exchanged technical information concerning safety and environmental matters to the extent that most refiners engage in exchanges of that type of information.

Each company arranged for its own legal, contracting, financial, and banking services. There were no joint borrowings. Neither company guaranteed any debts of the other. NCRA did make occasional loans of excess working capital to Cenex at prevailing market interest rates.

NCRA's sales of its refined petroleum product to its stockholders are at arm's length prices determined by reference to markets established by unrelated parties. NCRA rarely purchases from Cenex, and, when it has, its purchases of truck tires and light cycle oil have been at market prices. Cenex purchases refined petroleum products from other suppliers.

NCRA did not participate in decisions about the operation of Cenex. Cenex participated in NCRA's decisions on refinery throughput volumes, product mix, and distribution volumes to the extent that any refiner or manufacturer has its largest customers designate quantities and delivery points and to the same extent as NCRA's other customers.

In 1994, NCRA and Cenex pooled insurance coverages. The savings were allocated between the two companies.

On appeal, Revenue argues that its decisions on the subject of unitary businesses are entitled to judicial deference and not subject to review, or, if subject to review, are reviewable only for arbitrariness, unlawfulness, or capriciousness. Revenue bases its position on K.S.A. 79-32,141, which authorizes only the Director of Revenue to require businesses to use the combined report method. We note that Revenue's arguments are contrary to K.S.A. 2001 Supp. 74-2438, which provides that "[a]n appeal may be taken to the state board of tax appeals from any finding, ruling, order, decision, final determination or other final action . . . by any person aggrieved thereby." The statute further provides that "the board shall conduct a hearing in accordance with the provisions of the Kansas administrative procedure act. The hearing before the board shall be a de novo hearing unless the parties agree to submit the case on the record made before the secretary of revenue or the secretary's designee." We recently rejected this identical argument in *In re Tax Appeal of Panhandle Eastern Pipe Line Co.*, 272 Kan. 1211, 39 P.3d 21 (2002). We held:

"The authority of the Department is subject to review in that the legislature has conferred upon BOTA the authority to hear appeals of decisions of the Secretary of Revenue or the Secretary's designee. BOTA is the paramount, lawfully constituted taxing authority in Kansas and, as such, functions independently of the Secretary of Revenue in matters of administrative judgment and decision. Syl. ¶ 7.

"BOTA bears an independent responsibility to review the decision of the Department; this responsibility is foreign to the concept of deference. BOTA need not defer to the Department's interpretation of statute." Syl. ¶ 8.

In accordance with *In re Tax Appeal of Broce Construction Co., Inc.*, 27 Kan. App. 2d 967, 980-81, 9 P.3d 1281 (2000), BOTA presumed that Revenue's determination of unity was correct and placed the burden of proving otherwise on NCRA. BOTA concluded that the taxpayer met its burden by showing that NCRA and Cenex do not have a unitary relationship.

In its review, BOTA found:

"[T]he evidence does not show the requisite dependency or contribution between NCRA and Cenex to consider the entities unitary for combined reporting purposes. NCRA is in the business of refining crude oil into petroleum products, which are sold to its three members. Although Cenex is enttitled to purchase approximately 75% of NCRA's products, this is the nature of a cooperative and the two minority shareholders are likewise entitled to purchase products in proportion to each member's ownership interest."

BOTA distinguished the relationship between NCRA and Cenex from unitary relationships in *Broce Construction; In re Tax Appeal of A. M. Castle & Co.*, 245 Kan. 739, 783 P.2d 1296 (1989); and *Pioneer Container Corp. v. Beshears*, 235 Kan. 745, 684 P.2d 396 (1984). With regard to *Broce Construction*, BOTA stated that it "involved a Kansas corporation, its wholly owned Oklahoma subsidiary and the subsidiary's wholly owned Oklahoma subsidiary. The businesses were operated and controlled by the family patriarch in the same general line of asphalt paving. The corporations benefited from intercompany financing, loans and leases, and used common administrative functions." With regard to *A. M. Castle*, BOTA stated that it "involved a corporation and its wholly owned subsidiary. Castle and its subsidiary shared corporate officers and directors; the subsidiary made 5-day, 15-day, and monthly business reports to Castle; and they shared an advertising agency, insurance

carrier, accounting firm, and employee trust account." With regard to *Pioneer Container*, BOTA stated that it "involved another parent corporation and wholly owned subsidiary. Both companies were in the business of manufacturing bags for the agriculture industry. The parent corporation shared its accounting services, financing, business expertise, and operational expertise with its subsidiary. They even comingled funds. Essentially, the two companies operated as one."

BOTA stated with regard to NCRA and Cenex:

"Although the businesses of NCRA and Cenex may be considered to be in the same general line, an analysis of the totality of the facts indicates that the two corporations are not unitary. [BOTA] finds that the evidence in this matter does not show a strong central management coupled with centralized departments. The common management that does exist is due to mere shareholder activity. Unlike the unitary relationships in Broce Construction Co., Inc., A.M. Castle & Co., and Pioneer Container Corp., NCRA and Cenex have no common managers, officers or employees. They do not use each other's corporate facilities and they maintain separate departments for supply, production, environment and safety, transportation, accounting, personnel, human resources and public relations. Each entity arranges its own legal, contracting, tax, financial and banking services. Further, Cenex is not a wholly owned subsidiary of NCRA, nor is NCRA a wholly owned subsidiary of Cenex. Even though the two corporations have entered into some arm's length transactions, upon consideration of all of the facts of this case, the Board concludes that there is no strong central management present.

"[BOTA] finds that NCRA is not owned or controlled directly or indirectly by Cenex, nor is Cenex owned or controlled directly or indirectly by NCRA. [BOTA] has not addressed this issue in previous decisions because the previous cases have involved parent corporations and wholly owned subsidiaries and corporations whose stock was owned by the same entity. Upon consideration of the nature of a cooperative and the transactions that have taken place, it is clear that Cenex does not control NCRA, even though it is a majority shareholder. Further, the two minority shareholders, Growmark, Inc. and MFA Oil Co. have taken significant steps to protect their interests and to ensure that Cenex does not unilaterally control NCRA."

Revenue's assessment against NCRA for additional tax and interest is due to Revenue's determining, pursuant to K.S.A. 79-32,141, that NCRA and Cenex must use the combined report method of allocating income and expenses in order to clearly reflect income of the businesses. K.S.A. 79-32,141 provides:

"The director may allocate gross income, deductions, credits, or allowances between two or more organizations, trades or businesses (whether or not incorporated, or organized in the United States or affiliated) owned or controlled directly or indirectly by the same interests, if the director determines such allocation is necessary to prevent evasion of taxes or to clearly reflect income of the organizations, trades or businesses."

The Due Process and Commerce Clauses of the federal Constitution do not permit a state to tax a corporation's property, income, or gross receipts unless there is a link between the state and the corporation's activities within the state. The Supreme Court

"has insisted on such a link by reference to the unitary business principle.

"Under the unitary business principle, if a taxpayer is carrying on a single 'unitary' business within and without the state, the state has the requisite connection to the out-of-state activities of the business to justify inclusion in the taxpayer's apportionable tax base of all of the property, income, or receipts attributable to the combined effect of the out-of-state and in-state activities. By the same token, if the taxpayer's activities carried on within the state are not unitary with its activities carried on elsewhere, the state is constitutionally constrained from including the property, income, or receipts arising from those out-of-state activities in the taxpayer's apportionable tax base." 1 Hellerstein, State Taxation ¶ 8.07[1], pp. 8-58-59 (2001).

Between 1980 and 1992, the Supreme Court decided a series of cases delineating the constitutional scope of the unitary business for state apportionment purposes. The first case was *Mobil Oil Corp. v. Commissioner of Taxes*, 445 U.S. 425, 63 L. Ed. 2d 510, 100 S. Ct. 1223 (1980). In *Mobil Oil*, the Supreme Court identified "functional integration, centralization of management, and economies of scale" as factors of profitability that arise from the operation of the business as a whole. 445 U.S. at 438. In subsequent cases, the Supreme Court reiterated its observation that a unitary business is characterized by the three factors. See *Exxon Corp. v. Wisconsin Dept. of Revenue*, 447 U.S. 207, 222, 64 L. Ed. 2d 66, 100 S. Ct. 2109 (1980); *ASARCO Inc. v. Idaho State Tax Comm'n*, 458 U.S. 307, 317, 73 L. Ed. 2d 787, 102 S. Ct. 3103 (1982); *F.W. Woolworth Co. v. Taxation & Revenue Dept.*, 458 U.S. 354, 364, 73 L. Ed. 2d 819, 102 S. Ct. 3128 (1982); *Container Corp. v. Franchise Tax Bd.*, 463 U.S. 159, 179, 77 L. Ed. 2d 545, 103 S. Ct. 2933

(1983); *Allied-Signal v. Director, Div. of Taxation*, 504 U.S. 768, 781, 119 L. Ed. 2d 533, 112 S. Ct. 2251 (1992).

In *A.M. Castle*, the court discussed the three unities test used by California courts and stated that Kansas has adopted the other widely accepted test—the dependency/contribution test. 245 Kan. at 742.

In *Panhandle*, we said:

"A review of Kansas decisions reveals that in order to determine whether a corporate entity and its affiliates are engaged in a unitary business activity, the dependency/contribution test is proper. In *Crawford Manufacturing Co.*, this court endorsed the dependency/contribution test for unitary business activity, stating:

'Whether a multi-state business is separate or unitary depends upon the manner in which its business is conducted. The essential test to be applied is whether or not the operation of the portion of the business within the state is dependent upon or contributory to the operation of the business outside the state. If there is such relationship, the business is unitary.' 180 Kan. 352, Syl. ¶ 2.

'Stated another way, the test is whether a business' various parts are interdependent and of mutual benefit so as to form one business rather than several business entities and not whether the operating experience of the parts is the same in all places. [Citations omitted.] Various portions of a business may be carried on exclusively in different states without destroying its unitary character if the integral parts are of mutual benefit to one another.' 180 Kan. at 359." 272 Kan. at 1231-32.

In *Panhandle*, Revenue argued that Panhandle and National Helium Corporation were not unitary under K.S.A. 79-32,141. In so finding, Revenue applied a bright line test that before it will consider two or more businesses unitary, one must own more than 50% of the other. Revenue argued that BOTA must defer to its bright line test. We found no validity for such a bright line test and labeled it a red herring issue in that it "is not reflected in the language of the Kansas statutes, case law, or even in the Department's published regulations." 272 Kan. at 1229. We further stated:

"BOTA bears an independent responsibility to review a decision of the Department; this responsibility is foreign to the concept of deference. *Colorado Interstate Gas Co.*, 270 Kan. at 318. It would be illogical to ask BOTA to conduct a totally independent review and yet to insist that BOTA defer to the Department's interpretation of statute. Therefore, we conclude that BOTA did not act unreasonably by choosing not to follow the Department's more than 50 percent rule

and, instead, solely contemplating K.S.A. 79-32,141, K.A.R. 92-12-72, and Kansas case law in its resolution of the issue before it." 272 Kan. at 1230.

## K.A.R. 92-12-72 provides:

"A taxpayer may have more than one (1) 'trade or business.' In such cases, it is necessary to determine the business income attributable to each separate trade or business. The income of each business is then apportioned by an apportionment formula which takes into consideration the instate and outstate factors which relate to the trade or business the income of which is being apportioned.

"The determination of whether the activities of the taxpayer constitute a single trade or business or more than one (1) trade or business will turn on the facts in each case. In general, the activities of the taxpayer will be considered a single business if there is evidence to indicate that the segments under consideration are integrated with, dependent upon, or contribute to each other and the operations of the taxpayer as a whole. The following factors are considered to be good indicia of a single trade or business, and the presence of any of these factors creates a strong presumption that the activities of the taxpayer constitute a single trade or business: (a) A taxpayer is generally engaged in a single trade or business when all of its activities are in the same general line.

"(b) A taxpayer is almost always engaged in a single trade or business when its various divisions or segments are engaged in different steps in a large, vertically structured enterprise.

"(c) A taxpayer which might otherwise be considered as engaged in more than one (1) trade or business is properly considered as engaged in one (1) trade or business when there is a strong central management, coupled with the existence of centralized departments for such functions as financing, advertising, research, or purchasing. Thus, some conglomerates may properly be considered as engaged in only one (1) trade or business when the central executive officers are normally involved in the operations of the various divisions and there are centralized offices which perform for the divisions the normal matters which a truly independent business would perform for itself, such as accounting, personnel, insurance, legal, purchasing, advertising, or financing."

On this appeal, Revenue complains that BOTA seemed to require satisfaction of all three criteria of the regulation in order to find a unitary business. The regulation sets out three indicia of a unitary business and provides that any one of them gives rise to a strong presumption of a unitary business. The regulation also creates a sort of hierarchy of indicia. If all activities are in the same general line, a taxpayer "generally" is a unitary business; if vertically integrated, a taxpayer "almost always" is unitary; and central management will raise a presumption where other indicia are absent.

BOTA is a specialized agency that exists to decide taxation issues, and its decisions are given great weight and deference when it is acting in its area of expertise. *In re Tax Appeal of Univ. of Kan. School of Medicine*, 266 Kan. 737, 749, 973 P.2d 176 (1999). In the present case, a careful reading of BOTA's decision convinces us that BOTA fairly, although not formally, applied the regulation. The vertical integration of NCRA, which refines crude oil, and Cenex, which purchases the refined product, raised a strong presumption that the businesses are unitary. The strong presumption was rebutted, in BOTA's analysis, by NCRA's stronger evidence of the lack of dependency and contribution in all other aspects of the businesses. Evidence of separate and independent businesses, in BOTA's assessment, included lack of central management and arm's length transactions between the businesses.

BOTA's view of the evidence appears to be sound. The evidence showed that NCRA's only activity is refining crude oil and that Cenex sells farm supplies, including refined fuels, fertilizer, insecticides, herbicides, lubricants, propane, tires, vehicle accessories, and information/technology services. Cenex owns its own refinery for the production of asphalt, which NCRA does not produce. They do not cooperate in purchasing crude oil.

With regard to lack of central management, the evidence showed that the other two shareholders in NCRA sought and obtained a federal court's injunction of Cenex's attempt to exercise control over NCRA. As a result, NCRA continues to function on a cooperative basis and a general manager conducts day-to-day operations. The manager reports to a six-person board of directors, four of whom are appointed by Cenex as the 75% shareholder. The directors hold no other positions of authority over NCRA and do not participate "to any extent" in management or operation of NCRA. In addition, the businesses have no common managers, officers, or employees. Each has its own department for and independently handles all its personnel matters, production, security, accounting, legal, financial, and other matters that independent businesses perform for themselves. In one of the years at issue, 1994, NCRA and Cenex pooled insurance coverages and allocated savings between the two companies.

With regard to arm's length transactions, NCRA and Cenex have an arm's length lease agreement for three fuel storage tanks. NCRA on occasion has loaned excess working capital to Cenex at prevailing market interest rates. Cenex, like the other shareholders, has the right to purchase NCRA's refinery products in proportion to its percentage of NCRA stock. Cenex, like the other shareholders, participates in decisions on NCRA's refinery throughput volumes, product mix, and distribution volumes. Cenex's input and its right to purchase a certain proportion of the output certainly are not evidence of independence, but they are substantially countered by Cenex's purchases from NCRA being at arm's length prices determined by reference to markets established by unrelated parties.

BOTA's distinguishing the facts of the present case from other Kansas cases also appears to be sound, and BOTA's view of the evidence is consistent with the views expressed by this court and the Court of Appeals. As BOTA noted in its decision, in previous cases involving determinations that companies were conducting unitary businesses, the evidence of dependency and contribution is markedly stronger than in the present case.

In *Broce Construction*, the Court of Appeals determined that Broce Kansas and two Oklahoma corporations, Broce Oklahoma and Woodward Asphalt Inc., were unitary. All were in the business of asphalt paving and resurfacing; the two Broces "essentially shared equipment." 27 Kan. App. 2d at 973. Broce Oklahoma leased equipment from Broce Kansas below market rate and, in turn, subleased it to Woodward below market rate. Woodward is owned by Broce Oklahoma, which is a wholly owned subsidiary of Broce Kansas, which is controlled by Ray Broce, who owns 86% of its stock. He controlled all three, making the major business decisions. Broce Oklahoma transferred money to Broce Kansas by authorizing a highly unusual $750 per share dividend to its sole shareholder. Employees were shifted from Broce Oklahoma to Woodward and back again as business circumstances changed. The three businesses used the same law firm, insurance carrier, and accounting firm. There were many overlapping officers and directors of Broce Kansas and Broce Oklahoma, and many of them were family members of Ray Broce.

In *A.M. Castle & Co.*, 245 Kan. at 745-47, the court determined that A.M. Castle & Co. and its wholly owned subsidiary, Hy-Alloy Steels Company, were conducting a unitary business. The businesses shared many officers and directors, and there was evidence that Hy-Alloy management decisions were made by Castle. Hy-Alloy made frequent business activity reports and budget reports to Castle. The two businesses engaged in substantial intercompany product and asset sales and exchanges and occasional employee transfers. Castle obtained industrial revenue bond financing for the expansion of Hy-Alloy. The companies used the same advertising, insurance, and accounting firms. Their pension plans were separate, but the assets were combined to lessen administrative costs and increase earnings.

In *Pioneer Container Corp.*, 235 Kan. 745, the court determined that Pioneer Container Corporation and Pioneer Bag Company were unitary. Pioneer Container formed Pioneer Bag, owned all its stock, and hired its general manager. Both companies made bags for agricultural use, and the companies sold each other's products. Container paid Bag's bills from comingled funds. Container kept the cash receipt book for both companies. Bag's manager was not authorized to sign checks, and a Container executive signed all the checks for both companies. Container furnished accounting, financing, business experience, and operational expertise to Bag.

As BOTA stated, the three Kansas cases discussed in the preceding paragraphs involve wholly owned subsidiaries. The question of the tax status of two businesses where neither wholly owns or controls the other has not been addressed by BOTA or this court. Revenue asserts that BOTA decided that a unitary relationship may only be found between parent and wholly owned subsidiary corporations and that BOTA decided that cooperative enterprises are not subject to a unitary relationship finding. Revenue misconstrues BOTA's decision. BOTA did not make either circumstance the controlling factor in the determination of a unitary relationship. BOTA accurately noted that other Kansas cases on the subject have involved wholly owned subsidiaries and have not involved cooperatives.

In *Panhandle*, we stated that "this court concludes that, under K.S.A. 79-32,141, a strict requirement of more than 50 percent ownership is not necessary to demonstrate control in a unitary business relationship." (272 Kan. at 1235.) We further strived to achieve uniformity with federal law, particularly 26 U.S.C. § 482, which is comparable to K.S.A. 79-32,141. We note that "Treasury Regulation 26 C.F.R. § 1.482-1(i)(4), p. 538 (2001), states that " '[t]he term "controlled" includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise.' "

We do not find that BOTA erroneously interpreted or applied the law, and we conclude that BOTA's determination that neither NCRA nor Cenex is owned or controlled by the other, and thus is not a unitary business subject to combined filing requirement of K.S.A. 79-32,141, is supported by substantial evidence.

Affirmed.

DAVIS, J., not participating.

BRAZIL, S.J., assigned.