IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
June 3, 2010 Session

## BLUE BELL CREAMERIES, LP v. RICHARD ROBERTS, COMMISSIONER, DEPARTMENT OF REVENUE, STATE OF TENNESSEE

**Appeal by Permission from the Court of Appeals, Middle Section**
**Chancery Court for Davidson County**
**No. 06-414-III      Ellen H. Lyle, Chancellor**

_____

**No. M2009-00255-SC-R11-CV - Filed January 24, 2011**

_____

Taxpayer is a Delaware limited partnership that produces, sells, and distributes ice cream in Tennessee and elsewhere. At issue in this appeal is the Tennessee Department of Revenue's excise tax assessment on capital gains from a one-time stock transaction between Taxpayer and its holding company. Taxpayer sought a refund in chancery court, challenging the validity of the tax assessment on statutory and federal constitutional grounds. Both Taxpayer and the Department moved for summary judgment. The chancery court granted summary judgment to Taxpayer, and the Court of Appeals affirmed the judgment. Based on the uncontested facts in the record, we hold that Taxpayer's capital gains were business earnings pursuant to the functional test provided in Tennessee Code Annotated section 67-4-2004(1) (Supp. 2000) and therefore subject to the excise tax. Additionally, we hold that the tax assessment was constitutional pursuant to the unitary business principle. We therefore reverse the judgment of the Court of Appeals and enter summary judgment for the Department. We remand to the trial court to determine the amount of excise tax related to Taxpayer's capital gains.

**Tenn. R. App. P. 11 Appeal by Permission;**
**Judgment of the Court of Appeals Reversed;**
**Summary Judgment Granted; Case Remanded**

JANICE M. HOLDER, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., and GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Brad H. Buchanan, Assistant Attorney General, for the appellant, Richard Roberts,[1] Commissioner of Revenue, State of Tennessee.

James Campbell Bradshaw, Nashville, Tennessee, for the appellee, Blue Bell Creameries, LP.

Joe Barnett Huddleston, Washington, D.C., for the amicus curiae, Multistate Tax Commission.

**OPINION**

I.  Facts and Procedural History[2]

Blue Bell Creameries, LP ("Taxpayer") is a Delaware limited partnership with its principal place of business in Texas.  It produces, sells, and distributes Blue Bell ice cream in Tennessee and elsewhere.  On February 14, 2006, Taxpayer filed a complaint in the chancery court in Davidson County alleging that the Tennessee Department of Revenue ("the Department") improperly taxed Taxpayer's capital gains from Taxpayer's acquisition and sale of 1,131 shares of stock on January 1, 2001 ("the Stock Transaction").  The Stock Transaction was one part of a reorganization of the business entities that own Taxpayer and profit from the Blue Bell ice cream business.  The material aspects of the reorganization, including the Stock Transaction, occurred on January 1, 2001.

Prior to January 1, 2001, Taxpayer's predecessor corporation, which produced, distributed, and sold Blue Bell ice cream, was a subsidiary of Blue Bell Creameries, USA, Inc. ("BBC USA"), a holding company.  BBC USA owned the two subsidiaries that owned Taxpayer's predecessor organization.  The profits realized by Taxpayer's predecessor organization inured to the benefit of BBC USA and its stockholders.  BBC USA existed only to own the assets and properties of the related businesses and legal entities that operated the Blue Bell ice cream business.  This structure permitted the holding company to channel profits from the Blue Bell ice cream operation to its stockholders without incurring a Texas franchise tax.  The profits from the Blue Bell ice cream business were subject to two federal income taxes, one assessed on the holding company's income and one assessed on stockholders' dividend income from their stock in the holding company.

---

[1] In accordance with Tennessee Rule of Appellate Procedure 19(c), Richard Roberts, the current Commissioner of Revenue, has been substituted for his predecessors, Charles A. Trost, Reagan Farr, and Loren L. Chumley.

[2] Facts in Part I are from the parties' statements of undisputed facts and the documents cited therein.

The board of directors of BBC USA decided to reorganize to qualify as an S corporation taxed pursuant to subchapter S of the Internal Revenue Code. 26 U.S.C. §§ 1361-79 (2006). Election as an S corporation permits business entities to obtain "pass-through" tax treatment so that only the entity's owners are subject to federal taxes on the entity's income. BBC USA formed Taxpayer as a limited partnership, which allowed all income generated from the Blue Bell ice cream business to be subject to pass-through tax treatment. BBC USA also structured its other subsidiaries to provide pass-through tax treatment for income from the Blue Bell ice cream business. On January 1, 2001, the holding company caused all of the assets and liabilities of Taxpayer's predecessor organization, including operations for the Blue Bell ice cream business, to be transferred to Taxpayer.

Federal statutes governing the S corporation election required that S corporations have no more than seventy-five stockholders. 26 U.S.C. § 1361(b)(1)(A) (2000) (amended 2004). To satisfy this requirement, BBC USA permitted seventy-five stockholders to retain their ownership in BBC USA. BBC USA then permitted certain stockholders who could not retain their ownership in BBC USA to exchange all of their shares for an equivalent number of shares in the limited partnership interest of Taxpayer.

Approximately 250 stockholders contributed 1,131 shares of BBC USA to Taxpayer to obtain shares in Taxpayer equaling 29% of the limited partnership. BBC USA then redeemed the 1,131 shares of stock contributed to Taxpayer for $142,506,000. This price was set by BBC USA's board of directors to reflect the stock's fair market value as appraised by outside consultants. Following the Stock Transaction, BBC USA and its subsidiaries that own Taxpayer filed forms with the Internal Revenue Service for S corporation election and S corporation qualified election, and the reorganization was complete.

In addition to removing one level of federal income taxation, the reorganization had the effect of permitting the holding company and its subsidiaries to remain privately-held companies. This allowed BBC USA and its subsidiaries to avoid "the expense and inconvenience of registering its securities and publicly reporting its financial results," according to BBC USA's "Second Amended and Restated Plan of Reorganization." The production, distribution, and sale of Blue Bell ice cream remained unaffected by the reorganization, and the reorganization achieved its goal of reducing the expenses associated with federal taxation and federal reporting regulations.

Taxpayer reported capital gains of $119,909,317 on its 2001 federal income tax return. These capital gains were realized from the Stock Transaction in which Taxpayer received $142,506,000 from BBC USA's redemption of 1,131 shares of stock. Because Taxpayer is a pass-through entity, Taxpayer's partners incurred federal income tax liability for the capital gains that Taxpayer reported. Taxpayer thereafter distributed $94,106,645 of the $142,506,000 to its partners for payment of the taxes attributable to the capital gains.

On its Tennessee excise tax return, Taxpayer classified the $119,909,317 in capital gains as non-business earnings not subject to Tennessee's excise tax. The Department conducted an audit of Taxpayer. The Department classified the capital gains of $119,909,317 as business earnings subject to Tennessee's excise tax. The Department assessed Taxpayer $146,025.25 for its tax liability for the 2001, 2002, and 2003 tax years. Of the tax liability, the Department states that $120,676.61 was related to the capital gains from the Stock Transaction. Taxpayer made a payment in the amount of $146,025.25 and filed a complaint in chancery court seeking a refund of $128,407,[3] interest on any refund pursuant to Tennessee Code Annotated section 67-1-1803(b) (2006), and attorney's fees pursuant to Tennessee Code Annotated section 67-1-1803(d).

Both parties filed motions for summary judgment. The chancery court granted Taxpayer's motion for summary judgment and denied the Department's motion for summary judgment. The chancery court awarded Taxpayer a refund in the amount of $164,779.07 "as well as statutory interest continuing to accrue on the tax principal of $121,309.74 from December 1, 2008, until the refund is paid." The chancery court awarded attorney's fees and expenses but reserved judgment as to these amounts until the adjudication of all appeals. The Court of Appeals affirmed the chancery court's judgment. We granted permission to appeal.

## II. Analysis

The granting or denying of summary judgment is a matter of law, and we therefore review the trial court's grant of summary judgment to Taxpayer de novo. Blair v. W. Town Mall, 130 S.W.3d 761, 763 (Tenn. 2004). The party moving for summary judgment has the burden of introducing or identifying admissible facts in the record showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Mills v. CSX Transp., Inc., 300 S.W.3d 627, 631 (Tenn. 2009); see Tenn. R. Civ. P. 56.04. Neither element of summary judgment is waived merely because both parties have moved for summary judgment. Each party moving for summary judgment has the burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. See CAO Holdings, Inc. v. Trost, No. M2008-01679-SC-R11-CV, __ S.W.3d __, 2010 WL 5111414, at *7 (Tenn. Dec. 15, 2010).

Taxpayer and the Department both filed motions for summary judgment. Each party filed a different statement of undisputed, material facts, and neither party contested any fact

---

[3] Taxpayer stated that $128,407 is "the amount of all excise tax, interest, and penalties assessed by Defendant against and paid by [Taxpayer]" on the capital gains.

in the opposing statement.[4]  After carefully reviewing the record, we hold that there is no genuine issue of material fact.  Our analysis therefore is limited to whether either party is entitled to judgment as a matter of law.

Taxpayer asserts that the undisputed facts in the record show that the Department impermissibly classified the capital gains from the single Stock Transaction as business earnings contrary to Tennessee Code Annotated section 67-4-2004(1) (Supp. 2000) (current version at Tenn. Code Ann. § 67-4-2004(4) (Supp. 2010)).  Taxpayer further asserts that the Department's excise tax assessment on the capital gains that Taxpayer realized from the Stock Transaction during the reorganization violated the United States Constitution.  The Department asserts that the uncontested facts show that the tax assessment was valid pursuant to Tennessee Code Annotated section 67-4-2004(1) and the United States Constitution.

The determination of whether a tax assessment is contrary to statute or is unconstitutional requires an application of law to the facts.  See Newell Window Furnishing, Inc. v. Johnson, 311 S.W.3d 441, 443-44 (Tenn. Ct. App. 2008); Louis Dreyfus Corp. v. Huddleston, 933 S.W.2d 460, 469 (Tenn. Ct. App. 1996).  If the determination requires conclusions of law without any conclusions of fact, the matter is ripe for disposition by summary judgment.  See Green v. Green, 293 S.W.3d 493, 513 (Tenn. 2009).  We first address whether the Department's tax on the capital gains from the Stock Transaction was contrary to statute before addressing whether the Department's tax on the capital gains was unconstitutional.

## A.  Validity of Excise Tax Assessment

Taxpayer contends that the Department's excise tax on its capital gains from the Stock Transaction impermissibly classified the capital gains as business earnings contrary to Tennessee Code Annotated section 67-4-2004(1).  Tennessee's excise tax on corporate earnings is based on the Uniform Division of Income for Tax Purposes Act ("UDITPA"), a model law drafted by the National Conference of Commissioners on Uniform State Laws. Gen. Care Corp. v. Olsen, 705 S.W.2d 642, 644 (Tenn. 1986).  The excise tax is assessed to "net earnings," which are broadly defined as the income that the entity reports to the federal government.  Tenn. Code Ann. §§ 67-4-2005 to -2007 (Supp. 2000).  To determine the excise tax due from an entity that conducts business activities that are taxable both inside and outside of Tennessee, the taxpayer must "allocate or apportion its net earnings."  Tenn. Code Ann. § 67-4-2010 (Supp. 2000). Tennessee Code Annotated section 67-4-2011 (Supp. 2000) provides the manner in which a taxpayer allocates its earnings, and Tennessee Code

---

[4] The Department challenged Taxpayer's statements that included legal conclusions but did not contest any of Taxpayer's factual assertions.

Annotated section 67-4-2012 (Supp. 2000) provides the formula by which a taxpayer apportions its net earnings to determine its excise tax.

The apportionment formula uses a ratio based on Tennessee's portion of the taxpayer's property, payroll, and sales and is thus deemed to represent the entity's earnings that are derived from Tennessee. Gen. Care Corp., 705 S.W.2d at 644. Apportionment is designed "to obtain a rough approximation of the corporate income that is reasonably related to the activities conducted within the taxing State." Exxon Corp. v. Wisc. Dep't of Revenue, 447 U.S. 207, 223 (1980) (internal quotations omitted); accord Gen. Care Corp., 705 S.W.2d at 644. The apportionment formula is applied to an entity's "business earnings," which are defined as "earnings arising from transactions and activity in the regular course of the taxpayer's trade or business or earnings from tangible and intangible property if the acquisition, use, management or disposition of the property constitutes an integral part of the taxpayer's regular trade or business operations." Tenn. Code Ann. § 67-4-2004(1). The apportionment formula is not applied to "non-business earnings," which are defined as "all earnings other than business earnings." Tenn. Code Ann. § 67-4-2004(14). Non-business earnings instead are allocated for tax purposes to the state in which the non-business earnings originated.

Taxpayer specifically argues that its capital gains from the Stock Transaction were non-business earnings that are not subject to the excise tax. We determine whether earnings are business earnings and therefore apportionable when calculating the excise tax using either the transactional test or the functional test. Newell Window Furnishing, Inc., 311 S.W.3d at 446-47 (citing Assoc. P'ship I, Inc. v. Huddleston, 889 S.W.2d 190, 195-96 (Tenn. 1994)). Both tests are derived from the statutory definition of business earnings. The transactional test classifies earnings "arising from transactions and activity in the regular course of the taxpayer's trade or business" as business earnings. Tenn. Code Ann. § 67-4-2004(1); Assoc. P'ship I., Inc., 889 S.W.2d at 195. The functional test classifies "earnings from tangible and intangible property" as business earnings "if the acquisition, use, management or disposition of the property constitutes an integral part of the taxpayer's regular trade or business operations." Tenn. Code Ann. § 67-4-2004(1).

The earnings at issue in this appeal were from a one-time, extraordinary transaction. Specifically, the capital gains arose from Taxpayer's acquisition and sale of 1,131 shares of stock. The capital gains do not qualify as business earnings pursuant to the transactional test because the earnings did not arise from transactions or activity in the regular course of Taxpayer's ice cream business. The Department therefore is entitled to judgment as a matter of law as to this issue only if the uncontested facts show that the capital gains qualify as business earnings pursuant to the functional test.

In 1993, the General Assembly amended the definition of "business earnings" to explicitly include the functional test. 1993 Tenn. Pub. Acts 282 (current version at Tenn. Code Ann. § 67-4-2004(4)); see Assoc. P'ship I, Inc., 889 S.W.2d at 195 n.3. The Court of Appeals applied the functional test in Newell Window Furnishing, Inc., 311 S.W.3d at 447. The intermediate appellate court clarified that the determinative issue of the functional test is not whether the disposition of the property is an integral part of the taxpayer's regular trade or business operations but whether the property being disposed of constitutes an integral part of the taxpayer's regular business. Id. The tax at issue in Newell Window Furnishing, Inc. was assessed on earnings from the sale of one hundred percent of a corporation's capital stock, which was deemed a sale of assets for the purpose of federal taxation. 311 S.W.3d at 445 (citing 26 U.S.C. § 338(h)(10)). It was uncontested by the parties that the property at issue was integral to the taxpayer's regular business. Id. The Court of Appeals therefore held that the gain realized from the sale of the stock was business earnings pursuant to the functional test. Id.

Unlike the parties in Newell Window Furnishing, Inc., the Department and Taxpayer disagree as to whether the 1,131 shares of stock constituted an integral part of Taxpayer's ice cream business. Neither this Court nor the Court of Appeals has addressed how courts may determine whether property constitutes an integral part of the taxpayer's regular trade or business operations for the purpose of the functional test. Because the functional test is derived from the statutory definition of business earnings, our role is to ascertain and give full effect to the legislative intent in adopting the functional test. See State v. Marshall, 319 S.W.3d 558, 561 (Tenn. 2010). When the statute's language is unambiguous, we find the legislative intent in the plain and ordinary meaning of the language. Id.

The meaning of the phrase "property constitut[ing] an integral part of the taxpayer's regular trade or business operations" depends on the meaning of "integral," which has multiple definitions. Integral may be defined as "of, relating to, or serving to form a whole," as "essential to completeness," or as "organically joined or linked." Webster's Third New Int'l Dictionary 1173 (1993). These meanings are not interchangeable, and the precise meaning of the language "an integral part of the taxpayer's trade or business operations" is uncertain.

The statutory definition of "business earnings" in Tennessee Code Annotated section 67-4-2004(1) also provides, however, that "[t]his subdivision expresses the legislative intent to implement and clarify the distinctions between business and nonbusiness earnings, as found in the Uniform Division of Income for Tax Purposes Act, as generally interpreted by states adopting the act." Accordingly, we look for guidance to other jurisdictions that have adopted the UDITPA in applying the functional test. See Holiday Inns, Inc. v. Olsen, 692 S.W.2d 850, 853 (Tenn. 1985).

Courts are not uniform in their application of the functional test. See Walter Hellerstein, The Business-Nonbusiness Income Distinction and the Case for its Abolition, 92 Tax Notes 1701, 1714 (2001). Moreover, a court's application of the functional test may depend on the nature of the property being considered. Cf. McKesson Water Prods. Co. v. Dir., Div. of Taxation, 23 N.J. Tax 449, 457-62 (N.J. Tax Ct. 2007) (surveying applications of the functional test in cases in which the taxpayer is deemed to have sold all of its assets and distinguishing an opinion that relied on a case involving a transfer of funds from a pension plan). The matter before us concerns Taxpayer's capital gains from its acquisition and sale of stock rather than gains from the acquisition and sale of tangible assets. We therefore consider opinions from jurisdictions applying the functional test to earnings derived from investments.

Two state supreme courts have considered whether earnings obtained from investments in overfunded pension plans[5] are business earnings pursuant to the functional test. In Union Carbide Corp. v. Offerman, the North Carolina Supreme Court held that earnings obtained by a taxpayer from its overfunded pension plan constituted nonbusiness earnings. 526 S.E.2d 167, 171 (N.C. 2000). The court held that for earnings from property to qualify as business earnings, there must be some indicia of the taxpayer's ownership of the property and the property must be "essential to completeness" of the taxpayer's regular trade or business. Id. The earnings from the overfunded pension plan did not satisfy these factors. The taxpayer, Union Carbide, merely "was the plan's sponsor, not its owner." Id. at 170. Additionally, the assets from the pension plan were not essential to Union Carbide's regular business of producing and selling alloys and chemicals. Id. at 171. The court further observed that "the assets [from] the pension plan were not used to generate income in the regular business operations." Id. The assets were not used as working capital or for collateral. Id. The assets were not actively traded, used to purchase equipment, or used to support research and development. Id. The assets therefore failed to constitute business earnings pursuant to the functional test as adopted by the North Carolina Supreme Court.

The California Supreme Court applied the functional test differently when considering whether assets from an overfunded pension plan were business earnings in Hoechst Celanese Corp. v. Franchise Tax Bd., 22 P.3d 324, 343 (Cal. 2001). The court first determined that

---

[5] Federal income tax laws permit employers to establish qualified pension plans for employees in which employee contributions to the plan are not immediately taxable but employer contributions to the plan are immediately deductible as ordinary and necessary business expenses. A pension trust, not the employer, typically manages, invests, and distributes the employer's and employees' contributions as well as the earnings the contributions generate. If the assets in the pension plan exceed the amount the plan needs for future pension liability, the employer is entitled to receive the pension's excess assets. These earnings constitute ordinary income for federal tax purposes. Hellerstein, The Business-Nonbusiness Income Distinction and the Case for its Abolition, 92 Tax Notes 1701, 1710-11.

the functional test does not require "legal ownership or title to the property" for earnings from the property to be business earnings. Id. at 338. Instead, the language "acquisition, management, and disposition of the property" requires the taxpayer to "(1) obtain some interest in and control over the property; (2) control or direct the use of the property; and (3) transfer, or have the power to transfer, control of that property in some manner." Id.

The California Supreme Court next considered the plain meaning of the language in the functional test and determined that "integral" has multiple definitions. Id. at 339. Looking to the history of the distinction between business and nonbusiness earnings in the UDITPA, the California Supreme Court concluded that property is integral to the taxpayer's regular trade or business if "the taxpayer's control and use of the property . . . contribute materially to the taxpayer's production of business income so that the property becomes interwoven into and inseparable from the taxpayer's business." Id. at 338-39. This definition of business earnings, the court observed, encompasses less than all the property that contributes to the business and thus avoids constitutional concerns. Id. at 339-40. It encompasses, however, more than property that is "necessary or essential to" the taxpayer's regular business and therefore includes gains from the sale of property no longer used in the taxpayer's trade or business, a scenario contemplated in the explanatory comments to the UDITPA. Id. at 340 (citing UDITPA, cmt. following § 1(a) (West, current through 2009), *available at* http://www.law.upenn.edu/bll/archives/ulc/fnact99/1920_69/udiftp57.pdf (last visited Jan. 5, 2011)).

Using its construction of the functional test, the California Supreme Court determined that earnings from the overfunded pension plan were business earnings. The court observed that the taxpayer, Hoechst Celanese, exercised control over the plan and used the plan to retain current employees and to attract new employees. Id. at 343. Hoechst Celanese's management of the plan contributed materially to its business earnings "by improving the efficiency and quality of its workforce" generating the business earnings. Id.

After careful review, we adopt the functional test promulgated by the California Supreme Court. We agree that the language "acquisition, use, management or disposition of the property" in the definition of business earnings suggests that the taxpayer must control, but not necessarily own, the property for earnings arising from that property to qualify as business earnings. Tenn. Code Ann. § 67-4-2004(1). We also agree with the California Supreme Court that property must contribute materially to the production of business income to constitute an integral part of taxpayer's regular trade or business operations. Hoechst Celanese Corp., 22 P.3d at 338-39. This approach appropriately includes earnings from property that allows the taxpayer's business operations to prosper while excluding earnings from property that is incidental or unrelated to the taxpayer's business operations. We therefore hold that earnings from a taxpayer's property constitute business earnings pursuant

to the functional test if the taxpayer's control of the property contributes materially to taxpayer's production of business earnings.

Turning to the issue before us, the Department assessed the excise tax to Taxpayer's capital gains from its acquisition and sale of 1,131 shares of BBC USA stock. Taxpayer's acquisition and sale of the stock was a necessary step in the reorganization of the business entities that profit from the production, sale, and distribution of Blue Bell ice cream. The Stock Transaction did not affect Taxpayer's production, sale, and distribution of Blue Bell ice cream. Taxpayer's acquisition and sale of the stock, however, reduced expenses that detracted from the earnings arising from the sale of Blue Bell ice cream in Tennessee and elsewhere. This result was accomplished because the Stock Transaction completed the reorganization that allowed the business entitles profiting from the sale of Blue Bell ice cream to avoid costly public reporting requirements. The Stock Transaction and reorganization also removed one level of federal taxation on the earnings arising from the Blue Bell ice cream business. We hold that Taxpayer's acquisition and sale of the stock therefore contributed materially to the production of business earnings arising from the sale of Blue Bell ice cream and that Taxpayer's capital gains thus qualify as business earnings pursuant to the functional test. The Department has identified uncontested facts showing that it is entitled to judgment as a matter of law as to this issue.

## B. Constitutionality of Tax Assessment

Taxpayer contends, in the alternative, that the Department's tax was unconstitutional. The Due Process Clause of the Fourteenth Amendment to the United States Constitution imposes two requirements on a state's taxing power over a multistate business enterprise. Exxon Corp., 447 U.S. at 219-20. First, the taxing state must have some minimum connection with the business entity it seeks to tax. Allied-Signal, Inc. v. Dir., Div. of Taxation, 504 U.S. 768, 777 (1992) (quoting Miller Bros. Co. v. Maryland, 347 U.S. 340, 344-45 (1954)). Taxpayer conducts business in Tennessee. The Department therefore may tax Taxpayer.

The second requirement of the Due Process Clause is that there must be a rational relationship between the income attributed to the taxing state and the intrastate value of the business being taxed. Allied-Signal, Inc., 504 U.S. at 772. A state may not tax income from an activity or property to which the state does not have a connection, even if the state has a minimum connection to the actor or owner. Id. at 778 (stating that "in the case of a tax on an activity, there must be a connection to the activity itself, rather than a connection only to the actor"). The Commerce Clause imposes a "parallel" limitation that forbids states from levying taxes that discriminate against or burden interstate commerce "by subjecting activities to multiple or unfairly apportioned taxation." MeadWestvaco Corp. v. Ill. Dep't of Revenue, 553 U.S. 16, 24 (2008). These constitutional limitations prohibit states from

taxing value that is generated without any "protection, opportunities and benefits" from the taxing state. Id. at 24-25 (stating that the "broad inquiry" is "'whether the state has given anything for which it can ask return'" (quoting ASARCO Inc. v. Idaho Tax Comm'n, 458 U.S. 307, 315 (1982))).

Because the income of a multistate business enterprise like Taxpayer may be generated from a myriad of assets and activities across state lines, the United States Supreme Court has set forth guidance to assist taxing states in complying with the Due Process and Commerce Clauses. The United States Supreme Court has recognized that the value of a multistate business enterprise often cannot be fairly apportioned based solely on the business's activities or property within the borders of the taxing state. See MeadWestvaco Corp., 553 U.S. at 26. Accordingly, the United States Supreme Court permits states to tax an apportionable share of a multistate business enterprise rather than taxing only that part of the multistate business enterprise that is within the taxing state. Allied-Signal, Inc., 504 U.S. at 778. To ensure that a taxing state taxes its fair share of the value of a multistate business enterprise within the limitations imposed by the Due Process and Commerce Clauses, the United States Supreme Court adopted the unitary business principle. See id.

The unitary business principle provides that a state may tax an apportioned share of the income from a multistate business enterprise's unitary business if the unitary business is conducted in part in the taxing state. See MeadWestvaco Corp., 553 U.S. at 25. The operation of the unitary business in the taxing state creates a sufficient nexus between the taxing state and the unitary business's out-of-state activities or assets to satisfy Due Process and Commerce Clause concerns.

Taxpayer operates the Blue Bell ice cream business in Tennessee. Pursuant to the unitary business principle, the Department therefore may constitutionally tax Tennessee's fair portion of the Blue Bell ice cream business, including any income from out-of-state activities, assets, or business entities that are unitary with the ice cream business in Tennessee. The income at issue in Taxpayer's challenge is Taxpayer's capital gains from its acquisition and sale of stock during the reorganization. We must determine, therefore, whether the Stock Transaction and reorganization are unitary with Taxpayer's ice cream business.

The United States Supreme Court has used the "operational-function" concept to determine whether income derived from assets such as stock is part of the Taxpayer's unitary business. Allied-Signal, Inc., 504 U.S. at 787; accord MeadWestvaco Corp., 553 U.S. at 29 ("The concept of operational function simply recognizes that an asset can be part of a taxpayer's unitary business even if what we may term a 'unitary relationship' does not exist between the 'payor and payee.'"); see Walter Hellerstein, MeadWestvaco and the Scope of the Unitary Business Principle, 108 J. Tax'n 261, 263 (May 2008) ("[T]he Court explicitly

-11-

embraced the 'operational-function' concept as a basis for apportionability of income from *assets*." (emphasis in original)). The United States Supreme Court has held that income from a capital transaction such as the Stock Transaction and the reorganization is part of a taxpayer's unitary business if the capital transaction serves an operational function rather than an investment function. Allied-Signal, Inc., 504 U.S. at 787. An asset serves an operational function if the asset helps the taxpayer make better use of the taxpayer's existing business-related resources. Container Corp. of Am. v. Franchise Tax Bd., 463 U.S. 159, 178 (1983). The United States Supreme Court has stated that an investment function serves to diversify the entity and reduce the risks associated with "being tied to one industry's business cycle." Id. For the Department to be entitled to judgment as a matter of law as to this constitutional issue, therefore, the uncontested facts must show that the Stock Transaction and reorganization served an operational function.

Applying the United States Supreme Court's distinction between operational and investment functions to the present case, we hold that the Stock Transaction served an operational function rather than an investment function for the Blue Bell ice cream business. Taxpayer acquired and sold the 1,131 shares of stock solely as part of the reorganization of the entities profiting from the business. The Stock Transaction neither diversified the business nor reduced risks associated with the ice cream business. To the contrary, the Stock Transaction and reorganization served to increase net gain from the ice cream business. Because the capital transaction served an operational function for Taxpayer's business, Taxpayer's income from the stock is unitary with Taxpayer's ice cream business.

Taxpayer contends, however, that the Stock Transaction and reorganization were BBC USA's activities. In support, it points to the uncontested fact that BBC USA implemented and controlled the reorganization, including the Stock Transaction. Although the reorganization resulted in Taxpayer's formation, Taxpayer states that it was a passive participant in the reorganization and Stock Transaction. Taxpayer further asserts that BBC USA is not unitary with Taxpayer's ice cream business in Tennessee.

The operational-function concept is limited to determining when earnings from assets are part of the taxpayer's unitary business. Assuming *arguendo* that the Stock Transaction and reorganization were exclusively BBC USA's activities, the United States Constitution would prohibit the Department from taxing Taxpayer for capital gains from the Stock Transaction unless it first determined that BBC USA was unitary with Taxpayer's ice cream business. See MeadWestvaco Corp., 553 U.S. at 29-30. We therefore consider whether BBC USA and Taxpayer are unitary pursuant to the unitary business principle.

It is uncontested that BBC USA is a separate business entity from Taxpayer. To determine whether two separate business entities form a unitary business, we must look beyond the superficial divisions between parent corporations and their subsidiaries to the

"underlying activity" generating the income. See Mobil Oil Corp. v. Comm'r of Taxes, 445 U.S. 425, 440-41 (1980). To be an unrelated business activity, the separate business entity must constitute a "discrete business enterprise" from the taxpayer. Exxon Corp., 447 U.S. at 223-24.

For Taxpayer and BBC USA, the only underlying activity generating income is the production, sale, and distribution of Blue Bell ice cream. BBC USA may be a separate business entity, but it is uncontested that BBC USA does not conduct any business operations of its own. Furthermore, BBC USA exists as a separate business entity to channel income from Taxpayer to BBC USA's stockholders without incurring a Texas franchise tax, according to William Rankin, the Chief Financial Officer of Taxpayer's general partner. Mr. Rankin also characterized BBC USA and BBC USA's subsidiaries as part of the singular ice cream business and characterized the stockholders of BBC USA as investors in the ice cream business. Because both entities derive their income from a single underlying activity, we hold that BBC USA is unitary with Taxpayer's Blue Bell ice cream business.

Taxpayer contends, however, that it and BBC USA are not unitary pursuant to the tests that the United States Supreme Court has described for determining whether two businesses are unitary. Following the "hallmarks of a unitary relationship" test, for example, two separate business entities form a unitary business if their business operations are functionally integrated, have centralized management, and obtain economies of scale from their relationship. MeadWestvaco Corp., 553 U.S. at 30. The "three unities" test similarly provides that two separate business entities form a unitary business if there is "(1) unity of ownership; (2) unity of operation as evidenced by central purchasing, advertising, accounting and management divisions; and (3) unity of use of its centralized executive force and general system of operation." Barclays Bank PLC v. Franchise Tax Bd., 512 U.S. 298, 304 n.1 (1994) (quoting Butler Bros. v. McColgan, 111 P.2d 334, 341 (Cal. 1941), aff'd, 315 U.S. 501 (1942) (internal quotation marks omitted)). Finally, two separate business entities are unitary pursuant to the "dependency and contribution" test used by other states if the taxpayer's business operations in the taxing state are dependent on or contribute to the operation of the separate business entity outside the state. In re Nat'l Coop. Refinery Ass'n, 44 P.3d 398, 404 (Kan. 2002); see generally Louis Dreyfus Corp., 933 S.W.2d at 468 (citing courts that have used the dependency and contribution test).

These tests are ill-suited for assessing Taxpayer and BBC USA's relationship because all three tests require a comparison of the relationship of the separate business entities' business operations. Taxpayer admits that BBC USA "does not conduct any business operations." BBC USA therefore has no business operations that we can compare to Taxpayer's business operations.

Furthermore, the United States Supreme Court has placed the burden on the taxpayer challenging the tax assessment to demonstrate that the tax is unconstitutional. Butler Bros. v. McColgan, 315 U.S. 501, 507 (1942). Regardless of the analysis we use, it is Taxpayer's burden to identify clear and cogent evidence demonstrating that Taxpayer and BBC USA are discrete business enterprises. See Exxon Corp., 447 U.S. at 221; Mobil Oil Corp., 445 U.S. at 453-54. Our review of the record reveals no clear and cogent evidence showing that BBC USA operates a business enterprise that is discrete from that of Taxpayer. We therefore consider Taxpayer and BBC USA unitary. See Mobil Oil Corp., 445 U.S. at 439-40. Because the uncontested facts show that the Department's tax was constitutional, the Department is entitled to judgment as a matter of law.

We cannot determine from the record, however, whether Taxpayer is nevertheless entitled to a refund for any overpayment of taxes. The Department asserts that Taxpayer's excise tax for the capital gains was $120,676.61, relying on an affidavit by an auditor at the Department. Taxpayer, however, sought a refund of $128,407, which Taxpayer described as the amount of all excise tax, interest, and penalties paid by Taxpayer for the excise tax assessment on the capital gains. We therefore remand this matter to the trial court to determine the amount of excise tax related to the Stock Transaction.

## III. Conclusion

We conclude that the Department's assessment of excise tax on Taxpayer's capital gains from the January 1, 2001 Stock Transaction and reorganization was permissible pursuant to Tennessee Code Annotated section 67-4-2004(1) and the United States Constitution. Because the uncontested facts show that the Department is entitled to judgment as a matter of law, the trial court erred in granting Taxpayer's motion for summary judgment and in denying the Department's motion for summary judgment. We reverse the judgment of the Court of Appeals affirming the trial court's order and grant the Department summary judgment. We remand to the trial court to determine the amount of excise tax related to Taxpayer's capital gains and for further proceedings consistent with this opinion. Costs of this appeal are assessed against the appellee, Blue Bell Creameries, LP, for which execution may issue if necessary.

_____
JANICE M. HOLDER, JUSTICE

-14-