# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
November 21, 2013 Session

## VODAFONE AMERICAS HOLDINGS INC. & SUBSIDIARIES v. RICHARD H. ROBERTS, COMMISSIONER OF REVENUE, STATE OF TENNESSEE

**Appeal from the Chancery Court for Davidson County**
**No. 071860IV     Russell T. Perkins, Judge**

---

**No. M2013-00947-COA-R3-CV - Filed June 23, 2014**

---

At issue in this case is the methodology by which multi-state taxpayers are to compute their liability for franchise and excise taxes to Tennessee and, specifically, the authority of the Commissioner of Revenue to require the taxpayers to use an apportionment methodology other than the standard cost of performance methodology codified in Tenn. Code Ann. §§ 67-4-2012 and 67-4-2110. Plaintiffs, taxpayers that provide wireless communication and data services within and without Tennessee, contend they are entitled to apportion their receipts (income) based upon Tennessee's standard apportionment formulas because the majority of their "earnings producing activities" occurred in a state other than Tennessee. The Commissioner of Revenue disagreed, insisting that Plaintiffs' approach, even if statistically correct and derived from the language of Tenn. Code Ann. § 67-4-2012(i)(2), fails to meet the higher goal of fairly representing the business Plaintiffs derive from Tennessee. For this reason the Commissioner, acting pursuant to Tenn. Code Ann. § 67-4-2014(a), varied the standard formula requiring Plaintiffs to include "as Tennessee sales" its receipts from service provided to customers with Tennessee billing addresses. The trial court affirmed the decision. In this appeal, Plaintiffs contend the Commissioner does not have authority to impose a variance unless "unusual fact situations," which are unique to the particular taxpayers, produce "incongruous results" unintended by Tenn. Code Ann. § 67-4-2012; they also insist that no unusual fact situations exist and that no incongruous results occurred when the statutorily-mandated cost of performance methodology was applied. We have determined that the Commissioner acted within the scope of the discretion granted to him by the statutes and rules. Therefore, we affirm the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL,

P.J., M.S., joined. FRANK G. CLEMENT, JR., J., filed a dissenting opinion.

Michael D. Sontag, Stephen J. Jasper, and Ashley N. Bassel, Nashville, Tennessee, for the appellant, Vodafone Americas Holdings, Inc.

Robert E. Cooper, Jr., Attorney General and Reporter, William E. Young, Solicitor General, Charles L. Lewis, Deputy Attorney General, and Talmage M. Watts, Senior Counsel, Nashville, Tennessee, for the appellee, Richard H. Roberts,[1] Commissioner of Revenue, State of Tennessee.

## OPINION

The taxpayers, Vodafone Americas Holdings Inc. and several of its subsidiaries,[2] own a 45% partnership interest in Cellco Partnership,[3] a Delaware company that does business throughout the United States as Verizon Wireless phone services. Some of Cellco's customers, meaning customers of Verizon Wireless, had Tennessee billing addresses during the tax period at issue; other customers had billing addresses in other states.

For the tax period at issue, January 1, 2002 through March 31, 2006, Vodafone and its subsidiaries ("Plaintiffs") paid $13,645,288 in excise and franchise taxes to the Tennessee Department of Revenue. On August 16, 2007, Plaintiffs timely filed their original complaint

---

[1]Reagan Farr was the Commissioner of Revenue of the State of Tennessee when this action was commenced and he was a defendant in his official capacity. Tenn. R. App. P. 19(c) provides that when an officer of the state is a party in his official capacity and during the pendency of the action he ceases to hold office, the officer's successor is automatically substituted as a party. Richard H. Roberts succeeded Mr. Farr as Commissioner of Revenue. Thus, pursuant to Tenn. R. App. P. 19(c), Commissioner Roberts is substituted for Mr. Farr as the defendant.

[2]Vodafone Americas Holdings Inc. ("VAHI"), is a wholly owned, indirect subsidiary of Vodafone Group Plc, a British mobile phone operator headquartered in Newbury, Berkshire, England, which is a mobile telecommunications network company with ownership interests in 27 countries on five continents. VAHI has four direct and indirect subsidiaries: Vodafone Americas Inc. ("VAI"), Vodafone Holdings Inc. ("VHI"), JV PartnerCo, LLC, and AirTouch Paging, Inc. VHI and VAI are partners in a wholly-owned partnership, PCS Nucleus, L.P., a Delaware limited partnership. VAI is a wholly-owned subsidiary of VAHI and is a Delaware corporation with its principal place of business and commercial domicile during the years at issue being located in Walnut Creek, California. AirTouch Paging was a Nevada corporation with its principal place of business and commercial domicile during the years at issue being located in Walnut Creek, California. AirTouch Paging was merged into JV PartnerCo on March 31, 2003, with JV PartnerCo as the surviving entity. VAI is the single member of JV PartnerCo.

[3]Verizon Communications Inc. owns the remaining 55% interest in Cellco; however, Verizon Communications Inc. has no involvement in this appeal.

seeking a refund of franchise and excise taxes paid to the Tennessee Department of Revenue for the period at issue.

In the original complaint Plaintiffs contended, *inter alia*, that they were not subject to the franchise and excise tax because they did not conduct business in Tennessee during the relevant period.[4] The Commissioner filed an answer denying all claims.

While this action was pending, Plaintiffs commissioned a study by PricewaterhouseCoopers and, after receiving the report, decided they had been using "the wrong methodology" to calculate their franchise and excise tax liability to Tennessee. As a result, Plaintiffs filed an amended complaint on December 23, 2008, in which they asserted that they were entitled to calculate their Tennessee tax liability pursuant to the statutorily-mandated "cost of performance methodology" in Tenn. Code Ann. § 67-4-2012(i).

The operative claim for purposes of this appeal was asserted in Count Eight of the Amended Complaint, which reads as follows:

25. In the alternative, even if the earnings Plaintiff received as a result of its ownership interests in Cellco were to constitute business earnings subject to Tennessee franchise and excise tax, the amount of Tennessee franchise and excise taxes [Plaintiffs] paid during the years at issue was in error because the amounts paid were based on an incorrect over-apportionment of Cellco's sales to Tennessee during the years at issue.

26. Under Tennessee law, a taxpayer with business activities taxable both within and without the State of Tennessee must determine the amount of Tennessee franchise and excise taxes owed by apportioning its business earnings among the various states in which it conducts business. *See* Tenn. Code Ann. §§ 67-4-2110 and 67-4-2110 [sic]. The precise apportionment is determined according to the formula provided in Tenn. Code Ann. §§ 67-4-2012 and 67-4-2111 which, generally speaking, determines the percentage of a taxpayer's business earnings to apportion to Tennessee based on the average of the following factors: the property factor, the payroll factor, and the receipts or sales factor (this factor is double weighted). These factors represent the percentage - expressed in terms of a fraction - of a taxpayer's overall property, payroll, or sales located in Tennessee during the relevant tax period.

27. Under Tenn. Code Ann. § 67-4-2012(g), the receipt or sales factor is a

---

[4]This issue was referred to by the parties as the "nexus issue."

fraction, the numerator of which is a taxpayer's total receipts attributed to Tennessee during the relevant tax period and the denominator of which is the taxpayer's total receipts everywhere during the tax period. Tenn. Code Ann. § 67-4-2012(g) also provides that a taxpayer's ownership share of the gross receipts of a general partnership in which it has an ownership interest constitutes receipts to be included in the taxpayer's sales factor.

28. Assuming for the purposes of this Court that the earnings Plaintiff received as a result of its ownership interests in Cellco were business earnings subject to Tennessee franchise and excise tax, those earnings must be included in the denominator of Plaintiff's sales or receipts factor pursuant to Tenn. Code Ann. § 67-4-2012(g). The earnings, however, would only be included in the numerator of Plaintiff's sales or receipts factor to the extent those earnings could be attributed to Tennessee during the years at issue.

29. Under Tenn. Code Ann. § 67-4-2012(i), sales other than sales of tangible personal property are attributable to Tennessee - and, therefore, included in the numerator of a taxpayer's sales or receipts factor - if and only if the majority of the taxpayer's earnings producing activity related to the intangible property was performed in Tennessee. For those purposes, the determination of where the majority of a taxpayer's earnings producing activity took place is based on the cost of performance associated with that activity.

30. In the franchise and excise tax returns [Plaintiffs] filed with Tennessee during the years at issue, [Plaintiffs] attributed to Tennessee earnings from the sales of Cellco's telecommunication service based on the billing addresses of Cellco's customers. In other words, earnings from sales of Cellco's telecommunication service were attributed to Tennessee if the customer to whom the service was sold had a Tennessee billing address. This method of attributing earnings from the sales of Cellco's telecommunication service was in error and contrary to Tennessee law. Because Cellco's sales of its telecommunication service constitute sales other than sales of tangible personal property, Tenn. Code Ann. § 67-4-2012(i) provides that the earnings from each such sale should only be attributed to Tennessee if the majority of costs incurred in providing the service sold took place in Tennessee.

31. By using the billing address of Cellco's customers, rather than a cost of performance analysis, to attribute to Tennessee earnings from the sale of Cellco's telecommunication service, [Plaintiffs] substantially overstated the amount of those earnings attributed to Tennessee in their franchise and excise

tax returns originally filed for the years at issue. The amount of Tennessee franchise and excise taxes [Plaintiffs] paid during the years at issue, therefore, was in error and contrary to the laws of Tennessee.

32. Accordingly, even if the earnings Plaintiff received as a result of its ownership interest in Cellco constitute business earnings subject to Tennessee franchise and excise tax, Plaintiff is entitled to a refund of Tennessee franchise and excise taxes for the years at issue, the amount of which is equal to the difference between the amount [Plaintiffs] paid and the amount that would be owed through the correct application of a sales factor that only attributed to Tennessee those earnings from the sales of Cellco's telecommunication service where the majority of costs incurred with regard to the service sold took place in Tennessee.

In their prayer for relief, Plaintiffs asked to "be awarded a refund of franchise and excise taxes in the amount of $13,645,288, together with such interest as may be due [Plaintiffs] under Tenn. Code Ann. § 67-1-1803(b);" plus "all of the costs of this cause, together with its reasonable attorney's fees and expenses of litigation incurred herein, pursuant to Tenn. Code Ann. § 67-1-1803(d)."

The Commissioner filed an answer on February 13, 2008, denying that Plaintiffs were entitled to any refund and requesting that he be awarded attorneys' fees and expenses pursuant to Tenn. Code Ann. § 67-1-1803(d) should judgment be rendered in his favor.

Two years later, by letter dated May 21, 2010, Plaintiffs were informed that the Commissioner, *sua sponte*, imposed a variance pursuant to Tenn. Code Ann. §§ 67-4-2014(a) and 67-4-2112(a) (also referred to collectively as "the variance statute"). The Commissioner ruled that a variance was necessary to effectuate an equitable computation and allocation that fairly represents the extent of Plaintiffs' business activities in Tennessee. Specifically, the variance imposed by the Commissioner required Plaintiffs to continue to assign to the numerator of the "sales factor" of the Tennessee apportionment formula its receipts for cell phone services (not cell phone products) it provided to customers with Tennessee billing addresses.[5] The net effect of the variance was that Plaintiffs could not employ the cost of performance methodology to calculate their tax liability to Tennessee.

Thereafter, each party filed a motion for summary judgment on the nexus issue, that being whether Plaintiffs conducted business in Tennessee during the relevant period, and the variance issue, which is the focus of this appeal. The trial court concluded that Plaintiffs

---

[5]This issue was referred to by the parties as the "variance issue."

conducted business in Tennessee during the relevant period and, thus, granted partial summary judgment in favor of the Commissioner on the nexus issue. As for the variance issue, the trial court denied both motions for summary judgment and, by agreement of the parties, the variance issue was tried based upon stipulated facts and exhibits.

In the memorandum and order, which was entered following the bench trial, the trial court stated in the section titled "Facts":

> In its Amended Complaint, [Plaintiffs] sought a substantial refund based on cost-of-performance sourcing, as opposed to the sourcing in its original returns based upon customer billing address. After *Bellsouth Advertising & Publishing Company v. Chumley*, 308 S.W.3d 350 (Tenn. Ct. App. 2009) *perm. app. denied*, March 1, 2010, ("*BAPCO*") was decided, then-Commissioner Farr, by letter dated May 21, 2010, issued a variance pursuant to the statutory authority of Tenn. Code Ann. §§ 67-4-2014(a) & 67-4-2112(a). The variance required [Plaintiffs] to continue to source to Tennessee receipts from sales of wireless services to customers with Tennessee billing addresses.
>
> Under the cost-of-performance methodology relied upon by [Plaintiffs], for the Relevant Period, the cumulative numerator of the sales factor of the apportionment formula would fall more than $1,200,000,000, from $1,357,566,794 to $150,896,965, an 89% difference from the billing-address sourcing used by [Plaintiffs] in its original [franchise and excise] returns. [Plaintiffs'] receipts from customers with Tennessee billing addresses, which receipts have not been included in the numerator of the sales factor through use of its cost-of-performance sourcing methodology, have not been reported to or claimed by any other jurisdiction. After application of its cost-of-performance sourcing methodology, the numerator of the sales factor of the apportionment formula in [Plaintiffs'] [franchise and excise] returns would include only sales of tangible personal property, and no revenues from its delivery of wireless services to customers in Tennessee. January 30, 2010, [Plaintiffs] ha[ve] filed refund claims based upon a nexus theory similar to the one advanced in this case in 12 other states and upon a similar cost-of-performance theory in 11 other states (18 total states, including Tennessee).

After quoting the Commissioner's variance letter, dated May 21, 2010, the trial court set forth the following observations in its memorandum and order:

> The Commissioner did not put great emphasis on the regulations in articulating his reasons for the variance. He put most of his emphasis on the statutory

-6-

standard requiring him to demonstrate that [Plaintiffs'] cost-of-performance approach did not fairly represent [Plaintiffs'] business activity in Tennessee. A review of the variance letter (Trial Exhibit 14), therefore, yields the following points:

1. [Plaintiffs'] original franchise/excise tax returns used the primary-place-of-use ("PPU") methodology, sourcing their earnings to the states where their cell phone customers were located; (¶ 3)[6]

2. [Plaintiffs'] specific calculation of the cost of performance, which the Commissioner challenged, resulted in a substantial reduction of [Plaintiffs'] gross receipts that they would use in the formula; (¶ 4)

3. After carefully studying the details of [Plaintiffs'] methodologies as presented to him, the Commissioner could not determine that the receipts were attributed to the actual place where [Plaintiffs] incurred the costs of providing services; (¶ 5)

4. The PPU method was readily substantiated, while the cost-of-performance was not and was potentially subject to arbitrary assignment of costs to particular states; (¶¶ 6-9)

5. The particular calculations offered included [Plaintiffs'] costs everywhere and did not capture Tennessee-specific costs, resulting in over a billion dollars in taxable receipts from Tennessee customers not being taxed in Tennessee or any other state; (¶¶ 10-11 )

6. The cost-of-performance methodology, coupled with their direct and indirect partnership interests in Cellco partnership, allows these particular taxpayers to shift over a billion dollars in previously taxable receipts in such a way that they are not captured by Tennessee or any other state; (¶ 12) and

7. Given all of the foregoing, the Commissioner concluded that

---

[6]The parenthetical references are to the specific paragraphs in the Commissioner's variance letter (Trial Exhibit 14).

the cost-of-performance methodology, as proposed by [Plaintiffs], did not fairly reflect [Plaintiffs'] business activity in Tennessee and, conversely, that use of what the Commissioner characterized as the PPU method would fairly represent the extent of [Plaintiffs'] business activities in Tennessee. (¶¶ 12 & 14).

The trial court continued by referencing pertinent testimony of each party's expert witness, both of whom the court found to be "distinguished experts on the variance question." The court noted in pertinent part:

Professor John A. Swain, a law professor at the University of Arizona Rogers College of Law, testified on [Plaintiffs'] behalf. Professor Swain concluded that "[t]here are no unusual circumstances to justify the imposition of the Variance" and that the problems that the Commissioner articulated in support of the variance "apply equally to all providers of telecommunication services." Trial Exh. 7, pp. 2 & 3. Additionally, Professor Swain opined that the Commissioner "cannot . . . enact the broader, industry-wide policy change effectuated by the Variance on a case-by-case basis through the imposition of a variance." *Id*. at 4.

Professor Swain concluded that the Commissioner applied the variance retroactively and that the Commissioner was not authorized through the variance procedure to prevent "so-called 'nowhere income.'" *Id*. at 4-5. He opined that "[t]he cost-of-performance methodology reaches a fair result when applied to [Plaintiffs] by taking into account all of the costs that are related to providing Verizon Wireless services." *Id*. Professor Swain concluded that the Commissioner abused his discretion in all of the foregoing respects given that "there were no unusual circumstances present that would justify the need to deviate from the legislative chosen methodology." *Id*. at 4-6.

The Commissioner's expert, Benjamin F. Miller, is a distinguished state tax lawyer with substantial legal, regulatory, and other pertinent experience. Mr. Miller opined that "two fundamental principles of [the Uniform Division of Income for Tax Purposes Act] are: (1) that no income should be assigned to more than one State; and (2) that no income should escape taxation, such income frequently being referred to as 'nowhere income.'" Trial Exh. 8, pg. 2 (footnote with citation omitted). Mr. Miller agreed with the Commissioner's conclusion in his variance letter, opining that "[a]doption of the taxpayers' proposal would result in none of the Tennessee sales being attributed to any

state and would result in a substantial portion of their income escaping any state taxation." *Id*. at 13.

In the section titled "Discussion and Conclusions of Law," the trial court conducted the following legal analysis:

> [T]he Commissioner's statutory and regulatory authority to issue variances is both narrow and discretionary. *See BellSouth Adver. & Publ'g Corp. v. Chumley*, 308 S.W.3d 350 (Tenn. Ct. App. 2009) ("*BAPCO*"); *American Bemberg Corp.v. Carson*, 219 S.W.2d 169 (Tenn. 1949). One of the variance statutes which applies here, Tenn. Code Ann. § 67-4-2014(a), reads as follows:
>
>> (A) If the tax computation, allocation or apportionment provisions of this part or chapter 2 of this title do not fairly represent the extent of the taxpayer's business activity in this state, or the taxpayer's net earnings, the taxpayer may petition for, or the department through its delegates may require, in respect to all or any part of the taxpayer's business activity, if reasonable:
>>
>> (1) Separate accounting;
>> (2) The exclusion of any one (1) or more of the formula factors;
>> (3) The inclusion of one (1) or more additional apportionment formula factors that will fairly represent the taxpayer's business activity in this state;
>> (4) The use of any other method to source receipts for purposes of the receipts factor or factors of the apportionment formula numerator or numerators; or
>> (5) The employment of any other method to effectuate an equitable computation, allocation and apportionment of the taxpayer's net earnings or losses that fairly represents the extent of the business entity's activities in Tennessee.
>
> Under the statute, the Commissioner has discretion to choose a narrow or sweeping change in the standard apportionment formula for a specific situation once he has decided to issue a variance. *See* Tenn. Code Ann. § 67-4-2014(a)(1)-(5). In other words, once the Commissioner has used his narrow discretion to determine that the taxpayer's use of the standard formula does not fairly represent the extent of the taxpayer's business activity in the state, then the Commissioner's discretion to choose a different methodology for a

particular taxpayer is, by the language of the statute, considerably broader. The pertinent regulation anticipates that the variance statute would "permit a departure from the allocation and apportionment provisions only in limited and specific cases." Tenn. Comp. R. & Regs. 1320-06-1-.35(1)(a)(4). This same regulation provides that the Commissioner's variance power "may be invoked only in specific cases where unusual fact situations (which ordinarily will be unique and nonrecurring) produce incongruous results under the apportionment and allocation provision contained in the Franchise and Excise Tax Laws." *Id*.

In short, the Commissioner is permitted to issue a variance in a situation when application of the statutory formula would yield a result that does not "fairly represent the extent of the taxpayer's business activity in Tennessee," or the taxpayer's net earnings. *BAPCO*, 308 S.W.3d at 367. In examining the question of whether the "tax computation, allocation or apportionment provisions . . . fairly represent the extent" of the taxpayer's business activity or net earnings in Tennessee, Tenn. Code Ann. § 67-4-2014(a), the regulation provides that a variance or "a departure from the allocation and apportionment provisions" is permitted "only in limited and specific cases." *Id*. at 367. Additionally, the regulation anticipates that these "limited and specific cases" would be "where unusual fact situations . . . produce incongruous results[.]" *Id*. Parenthetically, the regulation provides that these unusual fact situations producing incongruous results are "ordinarily . . . unique and nonrecurring." *Id*. In *BAPCO*, the Court pointed out that use of the "ordinarily" qualifier permitted the Commissioner to issue a variance in circumstances that may not necessarily be "unique and nonrecurring." *BAPCO*, 308 S.W.3d at 367. . . . .

As indicated above, variance regulations permit the Commissioner to grant a variance "only in limited and specific cases." Tenn. Comp. R. & Regs. 1320-06-1-.35(1)(a)(4). The Commissioner is permitted to grant a variance only in specific cases "where unusual fact situations (which ordinarily will be unique and nonrecurring) produce incongruous results" under the apportionment statutes. *Id*. The Court concludes that the Commissioner's decision to issue the variance here complies with these regulations and that the Commissioner has met his burden of proof here.

The Court agrees that this case is not really on all fours with *BAPCO*. The situation in *BAPCO* was factually different than the situation in this case.

*BAPCO* is helpful, however, to the analysis here because it affirms that the Commissioner's variance decisions must be reasonable and follow the applicable statutory and regulatory language. *BAPCO* also reiterates that the scope of the Commissioner's discretion is narrow in determining whether a taxpayer's apportionment methodology fairly represents a taxpayer's business activity in the state. For the reasons stated in this Memorandum and Order, the Court concludes that the Commissioner properly followed *BAPCO* and the variance statutes and regulations.

In its "Conclusion," the trial court held that the Commissioner "met his burden of showing that the variance was properly issued" and the Commissioner "properly exercised his discretion under [the Uniform Division of Income for Tax Purposes Act] regulations in issuing the variance." Citing Tenn. Code Ann. §§ 67-4-2014(a) and 67-4-2112(a), the trial court also held that the variance was issued in response to a "tax computation, allocation or apportionment" which did not "fairly represent the extent of the taxpayer's business activity in the state." Thus, the trial court dismissed Plaintiffs' amended complaint and entered judgment in favor of the Commissioner.[7] This appeal followed.

### STANDARD OF REVIEW

Courts are to construe statutes to ascertain and give effect to the intention and purpose of the legislature. *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004); *Lipscomb v. Doe*, 32 S.W.3d 840, 844 (Tenn. 2000); *Am. Tel. & Tel. Co. v. Huddleston*, 880 S.W.2d 682, 686 (Tenn. Ct. App. 1994) ("*AT&T*"). "'Legislative intent is to be ascertained whenever possible from the natural and ordinary meaning of the language used, without forced or subtle construction that would limit or extend the meaning of the language.'" *Eastman*, 151 S.W.3d at 507 (quoting *Lipscomb*, 32 S.W.3d at 844) (quoting *Hawks v. City of Westmoreland*, 960 S.W.2d 10, 16 (Tenn. 1997)). If the statute is clear and unambiguous, we must apply the language's plain meaning in its normal and accepted use, without a forced interpretation that would limit or expand the statute's application. *Id*. However, if an ambiguity exists, we are to consider the entire statutory scheme and elsewhere to ascertain the legislative intent and purpose. *Id*.

"The statute must be construed in its entirety, and it should be assumed that the legislature used each word purposely and that those words convey some intent and have a meaning and a purpose." *Id*. "The background, purpose, and general circumstances under

---

[7]The trial court also ruled that the Commissioner was entitled to an award of attorneys' fees under Tenn. Code Ann. § 67-1-1803(d). The amount of fees to be awarded was reserved pending application after all appeals have been resolved.

which words are used in a statute must be considered, and it is improper to take a word or a few words from its context and, with them isolated, attempt to determine their meaning." *Id.*

We must also consider the rules of construction specifically applicable to tax statutes. *Id.* "Statutes imposing a tax are to be construed strictly against the taxing authority." *Id.* (citing *Covington Pike Toyota, Inc. v. Cardwell*, 829 S.W.2d 132, 135 (Tenn. 1992)).

**ANALYSIS**

**I. THE COMPETING ARGUMENTS**

Plaintiffs contend that Tennessee's statutory scheme expressly requires them to source their receipts for telecommunications services based upon the "cost of performance methodology" stated in our franchise and excise tax statutes, specifically, Tenn. Code Ann. §§ 67-4-2012(i)(2) and 67-4-2111(i)(2). They insist that service receipts are sourced -- on an all-or-nothing basis -- to a single state, that being the state where the preponderance of the taxpayer's costs of performing the service occur, under Tennessee's statutorily-mandated cost of performance methodology. Noting the stipulation of fact that the majority of Plaintiffs' "earnings producing activities" occurred in a state other than Tennessee, they conclude that no receipts from their telecommunications services, not even those attributable to customers with Tennessee billing addresses, can be sourced to Tennessee.

Plaintiffs identify the fundamental issue as follows:

Does applying the standard sourcing rule to Plaintiffs achieve the result the General Assembly intended when it adopted that rule? If so, the variance statute is inapplicable because Plaintiffs' business activities in Tennessee are measured in the way the General Assembly intended and, thus, those activities are 'fairly represented' in accordance with the policy decisions of the General Assembly.

The Commissioner insists that Plaintiffs' approach, even if statistically correct and derived from the language of Tenn. Code Ann. § 67-4-2012(i)(2), fails to meet the higher goal of fairly representing the business Plaintiffs' derive from Tennessee. The Commissioner states he exercised authority expressly accorded by the General Assembly, pursuant to Tenn. Code Ann. § 67-4-2014(a), to vary the standard formula so as to fairly represent the extent of the taxpayer's business activity in this state. By imposing the variance, the Commissioner merely required Plaintiffs to include "as Tennessee sales" its receipts from cell phone service it provided to customers with Tennessee billing addresses. Thus, the Commissioner insists his approach was within his statutory authority to ensure that all franchise and excise

taxpayers pay an amount that reasonably comports with their Tennessee business in order to avoid an inequitable result.

Because each party relies on specific statutes to support their positions, and because the variance statute, Tenn. Code Ann. § 67-4-2014(a), permits the Commissioner, in certain circumstances, to supersede the statutorily-mandated apportionment methodology stated in Tenn. Code Ann. §§ 67-4-2012(i)(2) and 67-4-2111(i)(2), we must ascertain the intent of the General Assembly as it pertains to the Commissioner's authority to impose a variance.

## II. THE STATUTORY SCHEME

### A. FRANCHISE AND EXCISE TAXES

Tennessee's franchise and excise taxes are imposed for the privilege of doing business in the state.[8] *First Am. Nat'l Bank of Knoxville v. Olsen*, 751 S.W.2d 417, 421 (Tenn. 1987); *BellSouth Adver. & Pub. Corp. v. Chumley*, 308 S.W.3d 350, 352 (Tenn. Ct. App. 2009) ("*BAPCO*"). Tennessee Code Annotated section 67-4-2001 *et seq.*[9] codifies the excise tax, which is imposed on the net earnings of companies. Tennessee Code Annotated Section 67-4-2101 *et seq.*[10] codifies the franchise tax, which is imposed on the net worth of companies. Both statutory schemes are based on the Uniform Division of Income for Tax Purposes Act ("UDITPA"), a model law drafted by the National Conference of Commissioners on Uniform State Laws. *Blue Bell Creameries, LP v. Roberts*, 333 S.W.3d 59, 65 (Tenn. 2011). Tennessee's franchise and excise tax statutory scheme requires companies to pay taxes on their net earnings or losses as provided in Tenn. Code Ann. § 67-4-2010 *et seq.*, and on their net worth as provided in Tenn. Code Ann. § 67-4-2110 *et seq.*[11]

States are given wide latitude under the U. S. Constitution to adopt various methods

---

[8]The Tennessee Corporate Excise Tax, Tenn. Code Ann. § 67-4-2001 *et seq.*, and the Tennessee Franchise Tax, Tenn. Code Ann. § 67-4-2101 *et seq.*, are privilege taxes. *See First Am. Nat'l Bank of Knoxville v. Olsen*, 751 S.W.2d 417, 421 (Tenn. 1987). The Tennessee Excise Tax and the Tennessee Franchise Tax are imposed on different tax bases; the excise tax is based on the taxpayer's "net earnings," *see* Tenn. Code Ann. § 67-4-2007, while the franchise tax is based on the taxpayer's "net worth." *See* Tenn. Code Ann. § 67-4-2106. Nevertheless, the Tennessee General Assembly intends that "these taxes be taken in tandem and construed together as one scheme of taxation" and that both taxes are to be paid "in addition to all other taxes." *First Am.*, 751 S.W.2d at 421.

[9]Formerly Tenn. Code Ann. § 67-4-801 *et seq.* (Repl. 1998).

[10]Formerly Tenn. Code Ann. § 67-4-901 *et seq.* (Repl. 1998).

[11]Identical language appears in both sections.

for attributing earnings of multi-state companies to a taxing state. *AT&T*, 880 S.W.2d at 689 (citing *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 279 (1978)). There are three methods by which corporate income may be divided for excise/franchise tax purposes: (1) separate accounting; (2) allocation; and (3) apportionment. *Id*. (citing *Holiday Inns, Inc. v. Olsen*, 692 S.W.2d 850, 852 (Tenn. 1985)). The separate accounting method "seeks to determine a corporation's profits from its operations in each state as if conducted as separate entities to determine the profits attributable to each state's portion of the company's business." *Id*. The allocation method traces income to a source, meaning a particular state, and then attributes that income to that state. *Id*. The apportionment method "'takes all the corporate income and divides it among all jurisdictions where business is done, based on a formula that takes property, payroll, and sales into account.'" *Id*. (quoting *Holiday Inns*, 692 S.W.2d at 852).

Tennessee employs the apportionment method, and the apportionment provisions in effect today were adopted by the Tennessee General Assembly in 1976 based upon UDITPA. *AT&T*, 880 S.W.2d at 686. Companies doing business within and without Tennessee are entitled to apportion[12] their net earnings and net worth as specified in Tenn. Code Ann. §§ 67-4-2012 and 67-4-2111. Unless a variance is imposed pursuant to Tenn. Code Ann. § 67-4-2014, a company's net earnings and worth are apportioned and calculated in accordance with the standard statutory apportionment formula specified in Tenn. Code Ann. §§ 67-4-2012 (excise tax) and 67-4-2111 (franchise tax).

### B. TENNESSEE'S STANDARD APPORTIONMENT FORMULA

#### 1. The Franchise Tax Apportionment Formula

The statutory formula for apportionment of a multi-state company's franchise tax is set forth in Tenn. Code Ann. § 67-4-2111(a):

> Except as may otherwise be provided in this part, the net worth of a taxpayer doing business both in and outside Tennessee shall be apportioned to this state by multiplying such values by a fraction, the numerator of which shall be the property factor plus the payroll factor plus twice the receipts factor and the denominator of such fraction shall be four (4).

#### 2. The Excise Tax Apportionment Formula

---

[12]Apportionment is designed "'to obtain a rough approximation of the [taxpayer's] income that is reasonably related to the activities conducted within the taxing state.'" *Blue Bell Creameries*, 333 S.W.3d at 65 (quoting *Exxon Corp. v. Wis. Dep't of Revenue*, 447 U.S. 207, 223 (1980)).

The statutory formula for apportionment of a multi-state company's excise tax is an average of three separate factors: (1) the property factor, (2) the payroll factor, and (3) the sales (or receipts) factor, which is double-weighted. Tenn. Code Ann. § 67-4-2012(a). Only the "sales factor" is at issue in this appeal. The apportionment formula reads:

(a) Except as may otherwise be provided in this part, all net earnings shall be apportioned to this state by multiplying the earnings by a fraction, the numerator of which shall be the property factor plus the payroll factor plus twice the receipts [sales] factor and the denominator of such fraction shall be four (4).
. . .
(g) The receipts factor is a fraction, the numerator of which is the total receipts of the taxpayer in this state during the tax period, and the denominator of which is the total receipts of the taxpayer everywhere during the tax period. For this purpose, "gross receipts" includes a taxpayer's ownership share of the gross receipts of any general partnership, or entity treated as a general partnership for federal income tax purposes, in which such taxpayer has an ownership interest. A return being filed by a limited liability company that has a general partnership as its single member shall include in its receipts factor only the gross receipts attributed to the limited liability company. "Gross receipts" also includes a taxpayer's ownership share of gross receipts of any limited partnership, subchapter S corporation, limited liability company, or other entity treated as a partnership for federal income tax purposes, in which the taxpayer has an ownership interest, directly or indirectly through one (1) or more such entities, and that is not doing business in Tennessee and thus is not subject to Tennessee excise tax.
. . .
(i) Sales, other than sales of tangible personal property, are in this state, if the earnings-producing activity is performed:

(1) In this state; or
(2) Both in and outside this state and a greater proportion of the earnings-producing activity is performed in this state than in any other state, based on costs of performance.

Tenn. Code Ann. § 67-4-2012.

The term "earnings producing activity," referenced immediately, "applies to each separate item of income and means the transactions and activity directly engaged in by the taxpayer in the regular course of its trade or business for the ultimate purpose of obtaining

-15-

gains or profit." Tenn. Comp. R. & Regs. 1320-6-1-.34(2). The regulation further states that "earnings producing activity" includes but is not limited to the following:

> (a) The rendering of personal services by employees or the utilization of tangible and intangible property by the taxpayer in performing a service.
> . . .
>
> (d) The sale, licensing or other use of intangible personal property. The mere holding of intangible personal property is not, of itself, an earning producing activity.

Tenn. Comp. R. & Regs. 1320-6-1-.34(2).

## C. TENNESSEE'S VARIANCE STATUTE

The variance is a delegation of legislative authority to the commissioner. It must contain adequate standards to guide the agency in the exercise of its delegated authority. *State v. Edwards*, 572 S.W.2d 917, 919 (Tenn. 1978). Such delegations are "necessary to implement the expressed policy and program of a given statute." *Id*. The policy of the statute is plainly explained: "Doing business in Tennessee by any person or taxpayer, and/or exercising the corporate franchise, is declared to be a taxable privilege." Tenn. Code Ann. § 67-4-2005. The tax is "a recompense for the protection of [the entity's] local activities and . . . compensation for the benefits it receives from doing business in Tennessee." Tenn. Code Ann. § 67-4-2007(b); *See First Am. Nat'l*, 751 S.W.2d at 421 (citing former statute Tenn. Code Ann. § 67-4-806(b)). The need for the variance provision is also plain. When the UDITPA was created, the drafters recognized that many unusual fact situations existed and the formula would not be satisfactory for every one of them—thus, the need for the variance provision. *BAPCO*, 308 S.W.3d at 364-65.

The variance provision, Tenn. Code Ann. § 67-4-2014(a),[13] states:

> If the tax computation, allocation or apportionment provisions of this part or chapter 2 of this title do not fairly represent the extent of the taxpayer's business activity in this state, or the taxpayer's net earnings, the taxpayer may petition for, or the department through its delegates may require, in respect to all or any part of the taxpayer's business activity, if reasonable:

---

[13]There are actually two variance statutes, Tenn. Code Ann. §§ 67-4-2014 and 67-4-2112. They are identical except for the phrases "net earnings" in § 67-4-2014(a) and "net worth" in §67-4-2112(a).

-16-

(1) Separate accounting;

(2) The exclusion of any one (1) or more of the formula factors;

(3) The inclusion of one (1) or more additional apportionment formula factors that will fairly represent the taxpayer's business activity in this state;

(4) The use of any other method to source receipts for purposes of the receipts factor or factors of the apportionment formula numerator or numerators; or

(5) The employment of any other method to effectuate an equitable computation, allocation and apportionment of the taxpayer's net earnings or losses that fairly represents the extent of the business entity's activities in Tennessee.

The standards found in the variance statute are: (a) the apportionment does not fairly represent the extent of the taxpayer's business in Tennessee, and, (b) if (a) is found, then the commissioner may require one of the options in (1)–(5), if it is reasonable to do so. Tenn. Code Ann. § 67-4-2014(a). The department's administrative rules elaborate on the standards:

The employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's capital and net earnings for purposes of computing franchise and excise taxes. [Tenn. Code Ann.] §§ 67-4-911 and 67-4-812 permit a departure from the allocation and apportionment provisions only in limited and specific cases. [Tenn. Code Ann.] §§ 67-1-911 and 67-4-812 may be invoked only in specific cases where unusual fact situations (which ordinarily will be unique and nonrecurring) produce incongruous results under the apportionment and allocation provisions contained in the Franchise and Excise Tax Laws

Tenn. Comp. R. & Regs. 1320-6-1-.35(1)(a)(4).[14] Thus, the department imposes additional standards on itself. The cases in which other methods are used are limited and specific. They involve unusual fact situations which ordinarily are unique and nonrecurring where incongruous results are produced under the statutory formula. Subsection (1)(c) also directs that application for a variance must be in writing and must set forth the reasons why the statutory apportionment provisions do not fairly represent the extent of the taxpayer's

[14]The rule still refers to the former codifications of the current statutes. For purposes of this opinion, we presume that the rules are still valid.

business activity in Tennessee. Tenn. Comp. R. & Regs. 1320-6-1-.35(1)(c).[15] Further, the rule requires that, "[i]t must be shown by clear and cogent evidence that peculiar or unusual circumstances exist which would cause application of the said statutory provisions to work a hardship or injustice." *Id*.

### III. THE COMMISSIONER'S REASONS FOR THE VARIANCE

By letter dated May 21, 2010, the Commissioner corresponded with Plaintiffs, through their counsel. He acknowledged the pending litigation and notified Plaintiffs of his decision to issue a variance pursuant to authority granted by Tenn. Code Ann. §§ 67-4-2014 and 67-4-2112. The pertinent portions of the letter, in which he refers to Plaintiffs as "Taxpayers," read as follows:

> On their original franchise/excise tax returns filed with this Department, the Taxpayers used the pay-per-use or primary-place-of-use ("PPU") methodology to determine the gross receipts to be included in the numerators of the gross receipts factors of each of their apportionment formulas. Under the PPU methodology the Taxpayers sourced their earnings according to the locations of their cellphone customers.
>
> Now, through their refund claims and the resulting litigation, the Taxpayers assert that they are entitled to use a methodology that is different from the PPU methodology originally used to compute receipts. One of the principal theories that the Taxpayers advance in support of their refund claims asserts that the numerator of each Taxpayer's gross receipts factor in this apportionment formula should be determined under the provisions of Tenn. Code Ann. §§ 67-4-2012(i) and 67-4-2111(i), sometimes referred to as the cost-of-performance ("COP") methodology. Use of the so-called COP methodology, at least as the Taxpayers have calculated it, would result in a substantial reduction in the gross receipts that each Taxpayer would include in the numerator of the receipts factor of its apportionment formula for each tax period. As a result, there would be substantial reduction in each Taxpayer's franchise/excise tax liability.
>
> I have given careful study to information produced by the Taxpayers that

---

[15]The rule is written from the perspective that the taxpayer is the applicant; nevertheless, the same criteria have been applied to the Commissioner when the Commissioner imposes a variance that was not applied for by the taxpayer, a circumstance the Commissioner acknowledges on page 18 of his Appellee's brief in this appeal, stating "[b]y its very terms, the variance provisions of Section 18 were intended as a means for both taxpayers and tax administrators to effect the fundamental purpose of the UDITPA apportionment formula when the standard provisions of Section 17 (Tenn. Code Ann. § 67-4-2012(i)) do not capture the market."

shows the difference in the COP and PPU methodologies when applied in determining gross receipts to be included in the numerators of their apportionment gross receipts factors. The PPU methodology originally used by the Taxpayers sources receipts according to the places at which the Taxpayers' customers are located and where the cellphone services are provided. But the COP methodology proposed by the Taxpayers sources receipts according to the place where the taxpayer arguably incurs the costs of providing services.

The PPU method is straightforward and conceptually satisfying in that it treats as Tennessee receipts the payments that Tennessee customers/residents make for cellphone services provided by the Taxpayers. In this context, it is not reasonable to say that receipts from a Tennessee customer should be attributed to another jurisdiction because, for example, a call that he or she made was routed through some facilities in other jurisdictions or more of the Taxpayers' general overhead costs are incurred in other jurisdictions than in Tennessee. Under the PPU method, it is easy to determine the state to which receipts from services provided to the Taxpayers' cellphone customers should be attributed because a receipt from a customer residing in a particular state is attributed to that state. To verify whether a receipt has been correctly attributed to a particular state, it is only necessary to determine the state in which the cellphone customer from which the payment was received is located.

The COP method is not so straightforward because it sources receipts to the state where the greater proportion of the earnings-producing activity is performed, based on costs of performance. In the Taxpayers' particular situation, activities that produce earnings from providing cellphone service take place in multiple states. It may be a matter of judgment or opinion as to the particular state in which the greater portion of the earnings-producing activities associated with a particular receipt are performed based on costs of performance. At best, in the Taxpayers' particular situation, calculation of receipts to be included in the numerators of their gross receipts apportionment factors would be extremely complex using the COP method that the Taxpayers propose.

Costs associated with the performance of a particular earnings-producing activity that takes place across several states may, arguably, have been arbitrarily assigned by the Taxpayers to the various states in which the activity takes place. When attempting to verify whether a receipt has been correctly attributed to a particular state, the Department may find itself largely dependent on the opinions and judgments of the Taxpayers, which may, arguably, be considered biased.

I am aware of an October 30, 2009, memorandum prepared by

PricewaterhouseCoopers to explain the COP methodology that the Taxpayers propose to employ. It appears from that memorandum that the Taxpayers' calculations under their COP methodology include their costs for rendering all of their services to their customers everywhere, rather than being limited to their costs for rendering services in Tennessee. While the latter would doubtless be a complex calculation, it may well be that a reliable calculation under the COP method would produce a far different result than the Taxpayers claim.

According to the PricewaterhouseCoopers Memorandum, the states in which these Taxpayers had higher costs of performance than Tennessee were California, Georgia, and New Jersey, none of which follows a COP methodology. Because the statutes of some states in which Taxpayers do business do not employ a COP methodology, application of the COP method as calculated by the Taxpayers would result in many millions of dollars of their earnings from Tennessee residents escaping their fair share of taxation in Tennessee or anywhere else. As calculated by the Taxpayers, application of the COP methodology would mean that the overwhelming majority of these Taxpayers' earnings would not be captured in any other state. According to information provided by the Taxpayers, the receipts that escape taxation in any state when the Taxpayers apply their calculation of the COP methodology to the years in litigation exceed $1 billion.

It is clear to me that application of the COP methodology when determining gross receipts to be included in the numerators of the Taxpayers' gross receipts factors in their apportionment formulas would not fairly represent the extent of business activities conducted in Tennessee by the Taxpayers as a result of their direct and indirect general partnership interests in Cellco Partnership. Use of the COP methodology allows the Taxpayers, through their direct and indirect general partnership interests in Cellco Partnership, to derive substantial receipts from Tennessee markets without such receipts being accounted for in the Tennessee receipts factors of their franchise/excise tax apportionment formulas and without such receipts being recognized in other taxing jurisdictions.

Accordingly, I have decided to require a variance for the tax years under litigation and for all subsequent tax years pursuant to the authority granted me by Tenn. Code Ann. §§ 67-4-2014 and 67-4-2112.

Under the variance imposed, the Taxpayers will be required to determine the gross receipts to be included in the numerators of their apportionment formula gross receipts factors for the tax years in litigation and for all subsequent tax years by using the PPU methodology that they originally used when filing their franchise/excise tax returns for the tax years in litigation. I believe that use of

the PPU method is necessary to fairly represent the extent of the business activities that the Taxpayers conduct in Tennessee through their direct and indirect general partnership interests in Cellco Partnership.

The variance requirements described above will continue in effect so long as the circumstances justifying a variation remain substantially unchanged or until changed or discontinued by this Department, whichever occurs first.

## IV. APPLICATION OF THE COMMISSIONER'S VARIANCE

"The Department has the burden of showing that a variance was proper." *BAPCO*, 308 S.W.3d at 357. However, it must be remembered that "'[t]he Commissioner may . . . exercise reasonable discretion in determining whether facts or circumstances justify departure from the statutory formula.'" *Id*. at 367. (quoting *AT&T*, 880 S.W.2d at 691-92). The determinative question is whether the Commissioner acted within his discretion when he issued the variance.

The Commissioner found that the apportionment does not fairly represent the extent of the taxpayer's business in Tennessee. He determined that the cost of performance ("COP") methodology led to no (or minimal) tax liability on the part of the taxpayer to Tennessee and no liability anywhere else for Tennessee receipts.[16] The primary place of use ("PPU") methodology considers sources receipts where the taxpayer's customers are located and, in this case, leads to a tax liability of $13,645,288. In *BAPCO*, the tax to be paid under the statutory formula compared to the number of directories and amount of income from Tennessee was sufficient to find that the COP formula did not fairly represent BAPCO's business in Tennessee. *BAPCO*, 308 S.W.3d at 366. The same is true for Vodafone. Using the statutory method favored by Vodafone, its sales factor falls 89%, from $1,357,566,794 to $150,896,965. We cannot say that the Commissioner has not exercised "reasonable discretion in determining whether facts or circumstances justify departure from the statutory formula." *Id*. at 367.

The Commissioner's choice of an alternate method falls within the options provided in Tenn. Code Ann. § 67-4-2014(a)(4) & (5). The regulation contains additional standards to consider for an alternative method. An alternative may be used in limited and specific cases involving unusual fact situations which are ordinarily unique and nonrecurring when the statutory formula produces incongruous results. Tenn. Comp. R. & Regs. 1320-6-1-

---

[16]Such income is commonly called "nowhere income."

.35(1)(a)(4).[17]

Is this a limited and specific case? Yes. While it may provide a precedent for other similarly situated companies in the future, those similarly situated companies would be a very small part of all the entities that must pay the tax. The variance applied here will not lead to an evisceration of the statutory formula. Furthermore, the variance will not burden the taxpayer because the method chosen by the Commissioner is actually easier to compute and verify.

Is it an unusual fact situation? Yes. The deposition testimony of Professor John A. Swain indicates that the drafters of the UDITPA likely did not anticipate the wireless industry. Again, if the variance is precedent for other entities, there would not be many.

Is it ordinarily unique and nonrecurring? While it may be unique to this taxpayer or to this industry,[18] it does not appear to be nonrecurring. However, the use of the word "ordinarily" indicates that this is not a hard and fast requirement. In addition, Tenn. Code Ann. § 67-4-2014(d) states that, "When another method of tax computation, allocation or apportionment as set out above has once been established, it shall continue in effect so long as the circumstances justifying the variation remain substantially unchanged, or until changed or discontinued by the department, whichever occurs first." Clearly, recurrence was envisioned by the statute.

Is the result under the statute incongruous? We have already established that "[t]he

---

[17]At least one case suggests that the variance should be interpreted very narrowly. *See AT&T*, 880 S.W.2d at 692 ("Decisions regarding relief provisions have indicated that the purpose of such provisions was to assure that the apportionment of interstate source income provides a division which satisfies the requirements of fair apportionment under the Federal Constitution."). This court's most recent discussion of the variance provision, *BAPCO*, does not take such a narrow view. *BAPCO*, 308 S.W.3d at 367. We believe *BAPCO* is more consistent with the statutory language and implementing regulations.

[18]The limited application to this taxpayer or to this industry does not deprive the situation of its uniqueness. This limited application is distinguished from the situation in *Kellogg Co. v. Olsen*, 675 S.W.2d 707 (Tenn. 1984), where the Tennessee Supreme Court rejected the Commissioner's contention:

> The Commissioner points to the distortion which results when expenses incurred in earning non-taxable income are deductible as justification for her reduction of the dividends received deduction. That distortion, if any, is not peculiar to the facts of this case. It will exist in every situation in which the deduction is available to a corporation, and therefore we believe the distortion was contemplated and authorized by the legislature.

*Id*. at 709.

Commissioner may . . . exercise reasonable discretion in determining whether facts or circumstances justify departure from the statutory formula." *BAPCO*, 308 S.W.3d at 367. It has been suggested that the lack of taxation under the statutory formula is a policy choice and what other states do is irrelevant—that lack of taxation in other jurisdictions is not grounds to tax here. However, the Commissioner's authority to issue a variance is also a policy choice made by the legislature. It applies when the statutory formula "misfires."[19] Such instances were anticipated. Because it applies when the statutory formula does not "fairly represent the extent of the taxpayer's business activity in this state," the variance can apply where the state is entitled to receive more taxes as well as a situation where the taxpayer is entitled to pay less taxes. The fact that other states do not tax the Tennessee receipts indicates that it is not unfair for Tennessee to do so.[20] Furthermore, it is not reasonable to allow the company's Tennessee receipts to remain untaxed just because a call may be routed through facilities in other jurisdictions. Such a result is not consistent with the principles adopted in our statutes on taxation for the privilege of doing business in this state. Thus, there is "clear and cogent evidence that peculiar or unusual circumstances exist which would cause application of the said statutory provisions to work a hardship or injustice." Tenn. Comp. R. & Regs. 1320-6-1-.35(1)(c).

## V. CONCLUSION

We find that the issuance of the variance is within the discretion granted to the Commissioner by the statute. We further find that the variance is consistent with the rules promulgated by the department. Consequently, we affirm the trial court's decision upholding the variance.

Costs of appeal are assessed against Vodafone, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

---

[19]Consequently, the variance provision may be viewed as akin to a "catch-all" tax provision.

[20]Indeed, "[t]he goal of the UDITPA and the Tennessee statutes modeled on it is to ensure that each state taxes an appropriate portion of a corporation's income, so that no more than 100% of its income will be subject to tax in all jurisdictions." *BAPCO*, 308 S.W.3d at 352. Taxing otherwise untaxed income does not run afoul of this goal.